UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| H.J., by and through her Parents and Natural Guardians, A.J. and M.N., | ) ) ) | Civil File No. |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| MARSHALL PUBLIC SCHOOLS, ISD No. 413, | ) ) ) | **COMPLAINT** |
| Defendant. | ) ) ) ) | |

For their Complaint, Plaintiffs H.J. (Hallie), and her parents and natural guardians, A.J. (Tony) and M.N. (Melissa)(collectively Plaintiffs) state as follows:

## I.   PRELIMINARY STATEMENT

1.      Tony and Melissa, on behalf of their minor child, Hallie, a minor child with disabilities, are seeking compensatory relief under the Americans with Disabilities Act (ADA), 42 U.S.C. 12101 *et seq.*, Section 504 of the Rehabilitation Act of 1973 (Section 504), 29 U.S.C. Section 794; the Minnesota Human Rights Act (MHRA), Minn. Stat. § 363A.01, *et seq.* against the Marshall Public Schools (Marshall) or (Defendant) for disability discrimination.

2.      Hallie is an eight year old cancer survivor.  She contracted stage IV anaplastic large cell lymphoma at 19 months of age.  After one year of chemotherapy she was declared to be in remission.  However, as a result of her chemotherapy treatments, Hallie experienced long term side effects.  The side effects included generalized anxiety disorder, bilateral lower extremity peripheral neuropathy, constipation, gastro-esophageal reflux, insomnia, anxiety, and recurring

1

upper respiratory infections.  Hallie also has been diagnosed with Asthma.  From the time that Hallie began attending public school, her parents saw a pattern of upper respiratory infections (URIs) that begin in late November and/or early December of each school year.  The URIs become worse over time until surgeries in the following May or April are required to resolve the infections.

3.      During her cancer treatment and throughout early childhood, Hallie spent most of her time isolated from other children in order to reduce exposure to common childhood illnesses. She entered kindergarten suffering from an inability to regulate her body temperature, severe separation anxiety, peripheral neuropathy, constipation, asthma, and insomnia. Hallie missed 34 days in kindergarten.  At the beginning of first grade, Hallie's medical team, anticipating these conditions could interfere with her ability to fully participate in class, sent a letter to her school recommending a 504 plan be drafted to help deal with her ongoing medical conditions.  Without formal evaluation, her parents were told she did not qualify for a 504 plan.  As the year progressed Hallie often became ill and as a result of recurring infections and the necessary medical appointments, Hallie missed 34 days in kindergarten, 35 days during her first grade in 2012/13 and 54 days during her second grade in 2013/14.  According to Marshall administration there are 175 days in a school year.   Since the fall of 2012, Plaintiffs and Hallie's medical professionals have asked Marshall, in writing, to identify, evaluate and accommodate Hallie and her disabling conditions, including her absences related to her URIs.  From 2012 until the present Marshall has refused to identify, evaluate or accommodate Hallie in each area of impairment.

4.      The administrative law judge (ALJ) ordered Marshall to complete a comprehensive medical assessment of Hallie to consider all of her medical conditions and to reconsider her eligibility once the medical assessment was completed.

5.      At the same time that Marshall was refusing to identify, evaluate and accommodate Hallie, Marshall administrators began to threaten truancy and educational neglect proceedings against the Plaintiffs for Hallie's URI related absences. and the state's compulsory attendance laws.   This culminated in correspondence from a Marshall administrator threatening the family with truancy and educational neglect proceedings.

6.      Once the ALJ ordered medical assessment was completed, Marshall again denied Hallie eligibility under the IDEA and instead offered a Section 504 plan that continued to refuse to recognize the absences related to Hallie's URIs.

7.      As a result of Marshall's refusal to identify, evaluate and reasonably accommodate Hallie's medical and health related conditions, Defendant violated federal and state anti-discrimination statutes, including the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, *et seq*., Section 504 of the Rehabilitation Act (Section 504), 29 U.S.C. § 794, and the Minnesota Human Rights Act (MHRA), Minn. Stat. § 363A.01, *et seq*.  The Plaintiffs seek declaratory and injunctive relief under the acts, as well as compensatory damages and statutory attorney's fees and expenses.

## II.   JURISDICTION AND VENUE

8.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this case raises federal questions under the ADAA, Section 504 and Section 1983.

9.      Hallie and her parents have exhausted their administrative remedies as required under 20 U.S.C. § 1415(i) by pursuing an administrative due process hearing.

10.      The family's claims and remedies are authorized by 29 U.S.C. § 794(a); 28 U.S.C. §§ 2201 and 2202; 42 U.S.C. § 1983 and provide for declaratory, compensatory and any further relief deemed necessary and proper.

11.      Venue in this United States District Court is authorized by 28 U.S.C. § 1391(b) because the Defendant conducts business or reside in this United States District Court, and because this is where a substantial part of the events or omissions giving rise to the claim occurred.  Venue is appropriate in this United States District Court pursuant to 28 U.S.C. § 1391.

## III.  STATUTORY AND REGULATORY BACKGROUND

12.      Section 504 provides protections for children with disabilities by prohibiting discrimination against handicapped persons in federally funded programs such as public education. Section 504 and its regulations require the identification of all disabled children and the provision of appropriate educational services. 29 U.S.C. Section 794; 34 C.F.R. Section 104.1 *et seq.*

13.      Under Section 504, a "handicapped person" is defined as "any person who has a physical or mental impairment which substantially limits one or more major life activities." 34 C.F.R. Section 104.3.  The term "physical or mental impairment" is defined as "any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive, digestive, genito-urinary; hemic and lymphatic; skin; and endocrine; or (B) any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities. *Id*. The term "major life activities" is defined as "functions such as caring for one's self . . . learning." *Id*.

14.      Section 504 provides a mandate for public school systems to protect all handicapped students, even those who may not qualify under the categorical listings of IDEA.

Section 504 requires that "a public elementary or secondary education program shall annually undertake to identify and locate every qualified handicapped person residing in the recipient's jurisdiction who is not receiving a public education and take appropriate steps to notify handicapped persons and their parents or guardians of the recipient's duty under this subpart." 34 C.F.R. Section 104.32.

15.     Under Section 504, recipients of federal funds are required to "provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap." 34 C.F.R. Section 104.33(a). The term "appropriate education" is defined as "the provision of regular or special education and related aids and services that (i) are designed to meet individual educational needs of the handicapped persons as adequately as the needs of non-handicapped persons are met, and (ii) are based on adherence to the procedures that satisfy the requirements of Section 104.34, 104.35, and 104.36." 34 C.F.R. Section 104.33(b).

16.     Section 504 has a reasonable accommodations section:

> A recipient shall make reasonable accommodation to the known physical or mental limitations of an otherwise qualified handicapped applicant or employee unless the recipient can demonstrate that the accommodation would impose an undue hardship on the operation of its program.

28 C.F.R. § 41.53; 28 C.F.R. 35.130(b)(7).

17.     Section 504 and ADA are interchangeable in many respects.  *Layton v. Elder*, 143 F.3d 469, 472 (8th Cir. 1998).  The MHRA essentially provides the same protection as the ADA. *Somers v. City of Minneapolis*, 245 F.3d 782, 788 (8th Cir. 2001).

18.     The ADA prohibits a public school from discriminating against a qualified individual with a disability.  A "qualified individual with a disability." The ADA defines a disability as:

A physical or mental impairment that substantially limits one or more of the major life activities of such an individual . . . a record of impairment or being regarded as having such an impairment.

42 U.S.C. § 12102(2)(A)-(C).

19.     An "impairment" is defined as

Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine; or

Any mental or psychological disorder, such as an intellectual disability (formerly termed "mental retardation"), organic brain syndrome, emotional or mental illness, and specific learning disabilities.

29 C.F.R. § 1630.2(h).

20.     As with Section 504, the ADA recognizes "learning" as a major life activity.  29 C.F.R. § 1630.2(i).

21.     The regulatory language implementing the ADA set forth the following rules of construction associated with defining "substantially limits":

The following rules of construction apply when determining whether an impairment substantially limits an individual in a major life activity:

**(i)**     The term "substantially limits" shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. "Substantially limits" is not meant to be a demanding standard.

**(ii)**     An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability within the meaning of this section.

**(iii)**     The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether

discrimination has occurred, not whether an individual's impairment substantially limits a major life activity. Accordingly, the threshold issue of whether an impairment "substantially limits" a major life activity should not demand extensive analysis.

(iv)    The determination of whether an impairment substantially limits a major life activity requires an individualized assessment. However, in making this assessment, the term "substantially limits" shall be interpreted and applied to require a degree of functional limitation that is lower than the standard for "substantially limits" applied prior to the ADAAA.

(v)    The comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical analysis. Nothing in this paragraph is intended, however, to prohibit the presentation of scientific, medical, or statistical evidence to make such a comparison where appropriate.

(vi)    The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures. However, the ameliorative effects of ordinary eyeglasses or contact lenses shall be considered in determining whether an impairment substantially limits a major life activity.

(vii)    An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.

(viii)    An impairment that substantially limits one major life activity need not substantially limit other major life activities in order to be considered a substantially limiting impairment.

(ix)    The six-month "transitory" part of the "transitory and minor" exception to "regarded as" coverage in §1630.15(f) does not apply to the definition of "disability" under paragraphs (g)(1)(i) (the "actual disability" prong) or (g)(1)(ii) (the "record of" prong) of this section. The effects of an impairment lasting or expected to last fewer than six months can be substantially limiting within the meaning of this section.

29 C.F.R. § 1630.2(j).

**MARSHALL PUBLIC SCHOOLS – SECTION 504 POLICIES AND PROCEDURES**

22.     Marshall Public Schools had a Section 504 Policy and Procedure Manual (Section 504 Manual) that was not being implemented or used by Marshall educators.  Plaintiffs filed their administrative complaint and provided Marshall notice of their intent to seek relief under Section 504 for disability discrimination.  The Marshall Section 504 Manual adopted the regulatory language of Section 504 to implement its non-discrimination policy.  The policies provide specific procedures and forms to be used by educators to comply with Section 504. The Marshall educators did not follow the policies and procedures and no Section 504 Coordinator was identified in Marshall's 504 policy and procedure manual nor did a coordinator participate in the Plaintiffs' requests for identification, evaluation and provision of a Section 504 plan.

## IV.  PARTIES

23.     Hallie is an eight year-old girl born on 2 January 2006. She shares time between her parents', Melissa and Tony, residences at 202 East Main Street, Marshall, Minnesota and 506 Elaine Avenue, Marshall, Minnesota, respectively.  Hallie and her parents are residents of Marshall, Minnesota.

24.     Tony and Melissa are the parents and legal guardians of Hallie.

25.     Independent School District 413, Marshall Public Schools is a school district (a government entity) with its principal place of business at 401 South Sarasota, Marshall, Minnesota.

## V.  FACTS

26.     Hallie is an eight year old cancer survivor.  She contracted stage IV anaplastic large cell lymphoma when she was 19 months of age.  After one year of chemotherapy she was declared to be in remission.  As a result of her chemotherapy treatments, Hallie experienced some long term

side effects from the chemotherapy medication.  The affects included generalized anxiety

disorder, bilateral lower extremity peripheral neuropathy, constipation, gastro-esophageal reflux,

insomnia, anxiety, and upper respiratory infections (URIs).  Hallie also has been diagnosed with

Asthma and has had recurring sinus infections since kindergarten.  Hallie is a child with both

physical and mental impairments which affects many of her major life activities, including her

education.

27.     From the time that Hallie began attending public school, her parents and medical

practitioners have seen URIs that begin in November of each year.  The URIs become worse

over time until surgeries in April or May were required to resolve them.

28.     On August 29th 2007, at the age of 19 months, Hallie was diagnosed with stage IV

anaplastic large cell lymphoma after bouts of high fevers and lethargy.  At the time it was

diagnosed, it was also found in her bone marrow.  She started chemotherapy treatment on

September 6th 2007 and completed therapy on August 8th, 2008.  She was subsequently declared

to be in remission.  She is seen annually at the University of Minnesota, Pediatric Hematology-

Oncology (Oncology) for follow up care.

29.     When Hallie began attending school full time in kindergarten, she was experiencing

significant anxiety around separating from her parents, difficulty regulating her body

temperature, inability to concentrate, severe constipation, as well as absences associated with

recurring fevers and infections.  From the time that Hallie began to experience absences related

to her health in kindergarten, the Plaintiffs were requesting any assistance the public school

could render to help Hallie with her education.  The Plaintiffs have gained a lot of information

and have become more sophisticated in understanding how to formally request assistance, i.e.,

put requests in writing.  But from the very beginning to the present, Plaintiffs have asked all that

they have known to ask to assist Hallie with her physical and mental health disabilities so that she could gain equal access and benefit from her education.

30.     Because of Hallie's anxiety and absences, Hallie's parents brought her to the University of Minnesota Pediatric Neuropsychology ("U of M Pediatric Neuropsych") for a neuro-psychological evaluation.  On March 30, 2012, Drs Kelly E. King, Ph.D., L.P., and Rachel C. Weber, Ph.D. completed a pediatric neuropsychological evaluation and concluded that Hallie suffered from generalized anxiety disorder, which Dr King identified as a long term effect of her chemotherapy.  Dr King recommended that Hallie's parents consult with a child/adolescent psychiatrist for medication management and continue her psychotherapy services.  Dr Nicole Christianson became Hallie's child psychiatrist and continues to see Hallie to the present day, along with a therapist, Jari Johnson.  In addition to Hallie's anxiety, Dr King also recognized that Hallie was struggling with recurring infections and was missing school as a result.  Dr King's recommendations specific to the school setting included the development of an Individual Health Plan (IHP) to provide her with medication reminders in school for her acid reflux, asthma, adaptations in attendance policies to address her absences due an impaired immune system, and the development of a common criteria for school absences.  To address Hallie's anxiety, Dr King recommended a Section 504 plan and modifications and accommodations to the school setting, weekly meetings with a school social worker and consistent communications between the school and parents.

31.     The Plaintiffs provided the Pediatric Neuropsych to Marshall public school personnel in an effort to inform them of Hallie's needs and to get some help for Hallie.  Marshall educators did not initiate an to evaluation of Hallie or provide her with a Section 504 Plan.  With no response from Marshall regarding Hallie's anxiety and illnesses, the Plaintiffs asked that they be

permitted to accompany Hallie to her classroom to address Hallie's anxiety that often manifested at the beginning of the day during separation.  Other parents often accompanied their children to the classroom in the mornings.  Marshall permitted the Plaintiffs to do so but were insisting that the Plaintiffs reduce the distance they were bringing Hallie each week without consideration to Hallie's disability related needs.  It was not until after Jari Johnson requested in writing that the Plaintiffs accompany Hallie to her class room were her parents permitted to resume coming into the school. Marshall insisted that the therapist renew this request each year.

32.     On September 18, 2012, Pediatric Nurse Practitioner Jill Lunsford Lee (Lee) with the University of Minnesota, Pediatric Hematology-Oncology Long Term Follow Up Program (U of M Pediatric Oncology) wrote that Hallie had long term side effects from the chemotherapy that included constipation, bilateral lower extremity peripheral neuropathy (neuropathy), recurrent UTIs resolved, gastro-esophageal reflux, insomnia and anxiety. To address the neuropathy, Lee recommended Hallie receive physical therapy in school and accommodations in her footwear. Lee wrote that Hallie's generalized anxiety could manifest physically with headaches and upset stomach and should be addressed through modification to her class day, and a plan developed with Hallie's counselor/therapist to address the physical manifestations of anxiety in the school setting.  Plaintiffs provided the Defendant with a copy of the Lee correspondence.

33.     Hallie was seen again by U of M Oncology on August 23, 2013 for a follow up appointment and Lee again identified Hallie's chronic and acute late effects of the chemotherapy including constipation, bilateral lower extremity neuropathy, recurrent UTIs resolved, gastro-esophageal reflux, insomnia and generalized anxiety.  Lee noted in the report that Hallie required surgery in May 2013 to resolve the fevers and sinus infections.

34.     On October 8, 2013, during Hallie's second grade, Melissa requested in writing a special education evaluation.  Defendant Marshall initiated and completed the evaluation, finding that Hallie did not meet criteria for special education services in the identified areas of emotional/behavioral disorder (EBD) or as Specific Learning Disabled (SLD).  According to the evaluation, Marshall teachers did not take into consideration Hallie's eligibility under Other Health Disabled (OHD).

35.     Marshall noted in its evaluation that Hallie had missed 34 days in her kindergarten, 35 days in her first grade and by December 20, 2013, the date of Marshall's evaluation report, she had missed 45 days of school. Marshall included no information regarding her recurrent upper respiratory infections and her absences in the evaluation.

36.     The evaluation noted that there was a discrepancy between Hallie intellectual functioning and her academic performance in reading.  In the areas of math and written language Hallie performed in the average range while her performance in reading was in the low average range. Teachers had previously noted that Hallie struggled in reading and expressed concern over Hallie's absences. Hallie's first grade teacher asked Marshall administration about initiating a special education evaluation but she was told by Marshall administration not to initiate one on Hallie's behalf.

37.     Hallie was provided an individualized health plan (IHP) on the 28th of March 2012 for her 2011/12 school year.  The IHP addressed Hallie's need to use an inhaler at the school nurse's office and stomachaches that Hallie was experiencing.  The IHP is a regular education intervention that is not governed by any state or federal disability statute.  Plaintiffs have no due process or legal mechanism by which to challenge or change an IHP.  Marshall Public Schools has no policy or procedure by which Plaintiffs can challenge or change the IHP.

38.     The IHP written for Hallie's 12/13 school year identified the presenting problems as her asthma, bilateral weakness and generalized anxiety.  No Section 504 evaluation was initiated and no modifications and accommodations were provided.

39.     The IHP for Hallie's 2nd grade (2013/14), identified the presenting problems as Hallie's asthma, generalized anxiety disorder, constipation and clothing needs relating to her fluctuating body temperature in school.  While the IHP identifies Hallie's constipation as a presenting need the document is silent regarding this need.

40.     The Plaintiffs requested in writing on the 28th of January 2014 that Marshall Public Schools consider Hallie for a Section 504 Plan because of her susceptibility to illnesses and the impact the illnesses have on her educational performance.  An evaluation plan was written on the 3rd of February 2014 reflecting that the evaluation concern was "long-term effects of chemotherapy resulting in susceptibility to other common illnesses."  The evaluation plan identified that Hallie's illnesses "[are] directly impacting education performance."  The evaluation would include the school reviewing "medical/mental health provider records."

41.     Love, on the 3rd of February 2014, gave the Plaintiffs copies of Marshall's correspondence and 504 questionnaires to give to Hallie's medical and mental health practitioners.  The practitioners were to complete the questionnaires and return them to Love at Marshall.  The Plaintiffs delivered Marshall's correspondence and questionnaires but were not involved in the process of which documents were sent or received.  According to Marshall's records, the local nurse practitioner and U of M Oncology completed the questionnaires and sent them back. However, the questionnaires Marshall sent had neither date nor signature lines, thus the dates they were completed are unknown.  Both practitioners identified medical conditions,

including pertussis and frequent infections that affected Hallie's attendance at school.  Both practitioners requested accommodations to the attendance policy.

42.     Defendants did not ask any of Hallie's practitioners to identify Hallie's medical diagnosis and none of Marshall's documents asked that a licensed physician sign to verify a medical diagnosis.  Marshall teachers and administrators would testify that their denial of special education services and/or a Section 504 plan for Hallie was because she did not have a "current medical diagnosis from a licensed physician."

43.     On the 4th of February 2014, Love wrote to the Plaintiffs regarding "the attendance that Hallie has developed since the beginning of the school year."  According to Ms Love, Hallie had missed 39 of the 102 day school year at Park Side Elementary.  Ms Love asserted that because of the attendance policy and state law, until Plaintiffs could demonstrate that Hallie's absences were related to a medical condition, Plaintiffs would be required to provide medical documentation of each illness and without the documentation, Hallie's absences would not be excused.

44.     Plaintiffs did provide Marshall with each and every medical excuse from all of Hallie's medical and mental health practitioners.  The Plaintiffs brought Hallie to the local emergency rooms, urgent care and Hallie's nurse practitioner when Hallie spiked fevers, had difficulty breathing, was coughing or experiencing a URI.  Hallie's cough, over the period of time that Love is complaining, developed into bronchitis, pertussis and eventual surgery.  During this same period of time, Hallie was being seen by the U of M Oncology for follow up care and to find answers regarding the URIs.   U of M Oncology sent Hallie to medical specialists in immunology, pulmonary, and infectious diseases in an attempt to address the URIs.

45.     Marshall teachers and administrators testified in the administrative hearing that the reason Hallie was not entitled to special education and related services or a Section 504 plan is

because Marshall Public Schools did not have a *medical diagnosis signed by a licensed physician*.  However, Marshall's Section 504 eligibility policy, procedure and correspondence to Hallie's medical and mental health practitioners does not identify this preliminary requirement for Hallie to be identified and accommodated.

46.     Marshall Public Schools held a meeting on the 5th of February 2014 between the Plaintiffs, teachers and administration regarding the Plaintiffs' request for special education or accommodations under an IEP or a Section 504 Plan.  This meeting also included a discussion of the "documentation necessary for comprehensive evaluation."

47.     On the 27th of February 2014, Love corresponded again with the Plaintiffs.  Love's concern was that Hallie had "missed 54 full or partial days out of 118 total days of school."  Love asserted that Marshall was challenging the "legitimacy and consistency of" the physicians' notes that Marshall required the Plaintiffs provide.   According to Love, because the Plaintiffs produced the medical documents she previously demanded, and those notes came from five different medical facilities and nine different medical providers, the medical documents lacked legitimacy.  The physicians' notes Plaintiffs' provided were all visits to medical practitioners to address Hallie's URIs.   This included local emergency and urgent care providers, visits with Hallie's local nurse practitioner, visits to the U of M Oncology, and the recommended specialists.

48.     At the time Love wrote this letter, 2/27/14, Hallie's eligibility determination for a Section 504 Plan was pending.   Because Marshall questioned the validity of the medical documents they insisted the Plaintiffs produce, Love asked that Marshall administrator, Klint Willert, Superintendent, Darci Love, Cindy Pfieffer, school nurse, and Sabrina Ulrich, school social worker, meet alone with the medical and mental health practitioners, including Hallie's therapist,

Jari Johnson.  The Plaintiffs refused to be excluded from a meeting regarding their child.  Love closed the correspondence noting that Hallie's unexcused absences were "viewed as educational neglect and by law, will be reported to the department of Health and Human Services."

49.     Love again wrote to the Plaintiffs on March 6, 2014.  This correspondence was sent to Plaintiffs while Hallie's eligibility for a Section 504 plan was pending.  In this correspondence, Love raised concerns related to Hallie's attendance.  Love identified that she was requiring a signed medical excuse for a physician for each day Hallie was absent including three specific criteria that Love was insisting each physician provide on each excuse.  Love challenged the U of M Oncology's medical excuse that it provided for Hallie's absences.  She inaccurately asserted that the Plaintiffs were denying Marshall Hallie's medical and mental health records.   The Plaintiffs provided Marshall with signed medical releases, as well as their consent to the Section 504 evaluation.  Love repeated her concern about the number of medical excuses Marshall was receiving, and drew the erroneous conclusion that Hallie was not being followed by one physician.  The U of M Oncology was the medical facility that followed Hallie and all her illnesses. Hallie's medical records reflect that the U of M Oncology had and continued to coordinate Hallie's medical and mental health care from the date of her cancer diagnosis to the present.  Love closed the correspondence with another reference to compulsory attendance laws, and educational neglect proceedings against the Plaintiffs.  Love also wrote that the child must have 7 or more unexcused absences to violate Marshall's attendance policy.

50.     As of March 6th, 2014, the date Love wrote her letter to the Plaintiffs, Hallie's attendance detail reflected that Hallie had no unexcused absences for a full school day and only had seven unexcused absences for afternoon classes.  Thus, Hallie attendance records did not support Marshall's attendance policy application.

51.     On the 11th of March 2014, Love provided the Plaintiffs with Marshall's Section 504

Eligibility Determination.  The Eligibility Determination noted that Hallie experienced a

"substantial number of absences with little evidence to substantiate need for absences (both

short-term and extended absences)."  With respect to Hallie's psychological needs related to her

long-standing generalized anxiety disorder, Marshall noted that there was "limited supporting

detail and outdated reports."  Overall Marshall's Eligibility Determination report found that

Hallie was not eligible under Section 504 because the medical and mental health information is

"limited and/or outdated."  Marshall educators wrote that this prevented them from making an

eligibility determination.  The Section 504 Eligibility Determination Team was made up of

Marshall education staff and administrators, including Love, and did not include the Plaintiffs.

52.     After Marshall denied Hallie eligibility under the IDEA and Section 504 and threatened

the Plaintiffs with truancy and educational neglect proceedings, the Plaintiffs requested a special

education administrative hearing under the IDEA.

53.     The parties participated in a special education administrative hearing on May 20th -22nd

2014.  The ALJ issued a final order on the 10th of June 2014 finding that Marshall had not

properly evaluated Hallie's medical needs.  Marshall was ordered to conduct a comprehensive

independent medical evaluation and to hire an education expert in the area of other health

disabled (OHD).  The purpose of the evaluation and experts was to reconsider Hallie's eligibility

under the IDEA.   The U of M Oncology recommended that Dr Joanna Perkins at Children's

Hospitals and Clinics conduct the independent evaluation.  Marshall refused and retained its own

experts without input from the Plaintiffs.  Marshall's retained experts ignored the URI related

absences and again concluded that Hallie was not eligible under the IDEA.

17

54.     As a result, the Plaintiffs brought Hallie to Dr Perkins at Childrens Hospital and Clinics. Dr Perkins completed a comprehensive medical evaluation, including a referral to an immunologist to  immunology abnormalities.  The immunologist concluded that Hallie's URIs are related to immunological abnormalities.

55.     From the conclusion of the ALJ ordered evaluations to the present, the Plaintiffs continued to ask for any assistance from Marshall, including a Section 504 plan.  Marshall has responded to the requests with Section 504 plans that did not include all of Hallie's mental and physical impairments, including her URI related absences.

56.     Hallie is a person with a disability defined by the ADA, Section 504 and MHRA.  Hallie has both the physical and mental impairments of generalized anxiety disorder, bilateral lower extremity peripheral neuropathy, constipation, gastro-esophageal reflux, insomnia, and URIs. Hallie's physical and mental impairments substantially limit the major life activity of learning, including her URI related absences from her public school instruction.

57.     By refusing to identify, evaluate and reasonably accommodate Hallie, Marshall caused Hallie to suffer harm and damages.  Those damages include the loss of a free appropriate public education, her state mandated right to an education, loss of educational opportunities, emotional and psychological harm, and the exacerbation of her existing mental health condition.

**ADMINISTRATIVE HEARING**

58.     On March 13, 2014, the Plaintiffs filed a Complaint and Request for special education administrative hearing with the Defendant and the Minnesota Department of Education.  The Plaintiffs raised claims under the IDEA, ADA, Section 504 and the MHRA.  The non-IDEA claims were dismissed without prejudice on the 25th of March 2014 (MDE File No. 14-016H; OAH File No. 5-1300-31365 *Second Prehearing Order* March 25, 2014).  The central purpose of

the complaint and administrative hearing was to get Hallie identified, evaluated and served as a student with a disability for all of her disabling conditions, including her recurring infections resulting in excessive absenteeism.

59.     The Plaintiffs were requesting that Hallie be identified as a student with a disability, evaluated and served under the state and federal acts.  During the administrative hearing, Defendant asserted that because Hallie did not have a *medical diagnosis* associated with her recurring infections, it was not a disabling condition under the IDEA.  The administrative law judge (ALJ) ordered Defendant to conduct a comprehensive medical assessment and reconsider Hallie for eligibility under the IDEA. (MDE File No. 14-016H; OAH File No. 5-1300-31365 *Final Order* June 10, 2014).  The U of M Oncology recommended an assessment by Dr Joanna Perkins at Children's Hospital and Clinics.  Defendant's rejected this recommendation and appointed Dr Mustafa Barbour at Sanford Medical Center (Sanford), Sioux Falls, South Dakota to conduct the independent medical evaluation.  The Plaintiffs followed the recommendation of Hallie's attending physicians and had Hallie evaluated by Dr Perkins at Children's.  The Sanford Report did not address acknowledge, identify or address Hallie's recurring infections and excessive absences.  Dr Perkins directly addressed Hallie's recurring infections and absences and recommended a Section 504 plan for Hallie.

60.     The Plaintiffs exhausted their administrative remedies under the Individuals with Disabilities Education Act (IDEA) by participating in a special education administrative hearing wherein the administrative law judge (MDE File No. 14-016H; OAH File No. 5-1300-31365 *Final Order* June 10, 2014) ordered Defendant to conduct a comprehensive medical assessment of Hallie, to hire a OHD specialist and to reconsider Hallie's eligibility for special education and related services under the IDEA.

61.     After Dr Perkins completed her evaluation and the report was provided, Defendant

agreed to meet to discuss Hallie's disabling conditions and the development of

# VI.  CLAIMS

## COUNT ONE

### SECTION 504 OF THE REHABILITATION ACT
### 29 U.S.C. § 794

62.     The Plaintiffs incorporate by reference paragraphs 1 - 61, as well as the Introduction as if

fully set forth herein.

63.     Defendant Marshall received federal funds and is a public entity as that term is used by

Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

64.     Marshall violated Section 504 by denying Hallie a free appropriate public education,

refusing to initiate an evaluation and to identify Hallie as a child with a disability within the

meaning of Section 504, refusing to reasonably accommodate Hallie's disabling conditions, and

refusing to modify its attendance policies and procedures.

65.     By failing to evaluate, identify and reasonably accommodate Hallie's disability in the

public school, Defendant Marshall discriminated against the Plaintiffs on the basis of disability,

thereby violating Section 504 of the Rehabilitation Act.

66.     Marshall violated Section 504 by subjecting Hallie to disability discrimination based on

her disability as set forth herein and failing to have adequate policies, procedures, protocols,

training and oversight so as to ensure Hallie was not subject to discrimination.

67.     Marshall and its administrators retaliated against the Plaintiffs as they sought to enforce

Hallie's rights under Section 504 by threatening educational neglect and truancy proceedings as

eligibility determinations for disability status was being requested and/or pending.

68.     Marshall's violations of Hallie's rights under Section 504 were intentional, grossly, recklessly and deliberately indifferent to Hallie's rights.  And as a result of Defendant Marshall's discriminatory conduct, plaintiffs were injured.

## COUNT TWO

### AMERICANS WITH DISABILITIES ACT
### 42 U.S.C. §§ 12131-65

69.     The Plaintiff incorporates paragraphs 1 through 68 as though fully set forth herein.

70.     Defendant Marshall is a public entity at that term is used by the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132.

71.     Marshall violated ADA by refusing to initiate an evaluation and to identify Hallie as a child with a disability within the meaning of the ADA, refusing to reasonably accommodate Hallie's disabling conditions, and refusing to modify its attendance policies and procedures.

72.     By failing to evaluate, identify and reasonably accommodate Hallie's disability in the public school, Defendant Marshall discriminated against the Plaintiffs on the basis of disability, thereby violating the ADA.

73.     Marshall violated the ADA by subjecting Hallie to disability discrimination based on her disability as set forth herein and failing to have adequate policies, procedures, protocols, training and oversight so as to ensure Hallie was not subject to discrimination.

74.     Marshall and its administrators retaliated against the Plaintiffs as they sought to enforce Hallie's rights under the ADA by threatening educational neglect and truancy proceedings as eligibility determinations for disability status was being requested and/or pending.

75.     Marshall's violations of Hallie's rights under the ADA were intentional, grossly, recklessly and deliberately indifferent to Hallie's rights.  And as a result of Defendant Marshall's discriminatory conduct, plaintiffs were injured.

21

**COUNT THREE**

**MINNESOTA HUMAN RIGHTS ACT**
**MINN. STAT. § 363A**

76.     The Plaintiff incorporates paragraphs 1 through 75 as though fully set forth herein.

77.     Defendant Marshall is a public service as that term is used by the Minnesota Human

Rights Act (MHRA), Minn. Stat. § 363A.03, subd 35.

78.     Marshall violated MHRA by refusing to initiate an evaluation and to identify Hallie as a

child with a disability within the meaning of the MHRA, refusing to reasonably accommodate

Hallie's disabling conditions, and refusing to modify its attendance policies and procedures.

79.     By failing to evaluate, identify and reasonably accommodate Hallie's disability in the

public school, Defendant Marshall discriminated against the Plaintiffs on the basis of disability,

thereby violating the MHRA.

80.     Marshall violated the MHRA by subjecting Hallie to disability discrimination based on

her disability as set forth herein and failing to have adequate policies, procedures, protocols,

training and oversight so as to ensure Hallie was not subject to discrimination.

81.     Marshall and its administrators retaliated against the Plaintiffs as they sought to enforce

Hallie's rights under the MHRA by threatening educational neglect and truancy proceedings as

eligibility determinations for disability status was being requested and/or pending.

82.     Marshall's violations of Hallie's rights under the MHRA were intentional, grossly,

recklessly and deliberately indifferent to Hallie's rights.  And as a result of Defendant Marshall's

discriminatory conduct, plaintiffs were injured.

## VII.  RELIEF

        **THEREFORE,** Plaintiffs respectfully request that this court:

  1.  A Declaratory Judgment, holding that Defendant's failure to identify, evaluate and

accommodate Hallie in the public school violated the ADA, Section 504, and the MHRA.

2. An Order directing Marshall to cease and desist from its practice of refusing to provide a Section 504 plans that reasonably accommodates children with disabilities who attend Marshall Public Schools.

3. An order granting injunctive relief requiring Defendant to provide Hallie reasonable accommodations pursuant to a complete and comprehensive Section 504 plan for all of Hallie's physical and mental health impairments, including but not limited to modification of the attendance policy for Hallie's URI related absences.

4. An order requiring Marshall to take such affirmative actions as necessary to provide reasonable accommodations to children with disabilities including, but not limited to developing policies, procedures and training for the identification, evaluation and accommodations for children with disabilities under Section 504 of the Rehabilitation Act.

5. An order directing Marshall to pay Plaintiffs compensatory damages for the emotional injuries the Plaintiffs suffered as a result of Marshall's unlawful actions in the amount of $75,000.00.

6. Order Defendant to pay treble damages pursuant to Minn. Stat. §§ 363A. 33, subd. 6 and 363A.29, subd. 4.

7. Award Plaintiffs their statutory attorney's fees and expenses.

8. Provide such other and further relief as the Court deems just and equitable.

Respectfully submitted,

**KANE EDUCATION LAW, LLC.**

Dated: 6 October 2014          /s/ Margaret O'Sullivan Kane
                               Margaret O'Sullivan Kane /ID # 220243
                               Attorney for Plaintiffs
                               420 Summit Avenue
                               Suite 306
                               Saint Paul, Minnesota 55102
                               651/222-8611

**VERIFICATION**

23

      I verify that I have read the foregoing Complaint, and that all of the facts and statements made therein are true and correct to the best of my knowledge, and as to those facts stated on information and belief, I also believe them to be true and correct.

Dated:_____          _____
                                          A. J.

Subscribed and sworn to before me
this _____ day of October 2014.


_____
Notary Public