UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| H.J., by and through her Parents and Natural Guardians, A.J. and M.N., | Civil File No. 14-CV-04182 (JRT/HB) |
| Plaintiffs, | **INDEPENDENT SCHOOL DISTRICT NO. 413's MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| Marshall Public Schools, ISD No. 413, | |
| Defendant. | |

## INTRODUCTION[1]

This case is about nothing more than a concerned school's attempts to ensure that a student attends school on a regular basis and provide her appropriate services if her medical condition actually prevents her from doing so. While Plaintiffs A.J. and M.M. ("Parents") allege that Independent School District No. 314, Marshall Public Schools ("District") discriminated against their daughter, Plaintiff H.J. ("Student"), because of her disability, nothing could be further from the truth. Throughout her enrollment in school, the District has offered H.J. accommodations for her medical condition. The District revised its offered accommodations to reflect all medical information provided by the Parents. The District has taken no action adverse to H.J. or her Parents because of her medical condition. Plaintiffs' discrimination claims are unsupported factually and fail as a matter of law and the District is entitled to summary judgment on those claims.

---

[1] This Motion is brought pursuant to Federal Rule of Civil Procedure 56 and, therefore, is exempt from the meet and confer requirements of Local Rule 7.1. L.R. 7.1(a).

<u>**STATEMENT OF UNDISPUTED FACTS**</u>

**A.**     **The District is Obligated by Law to Notify Parents When Their Students may be Considered Truant.**

The District is a public independent school district organized under the laws of Minnesota.  Approximately 2500 students attend its four schools.  Among its other obligations, the District is legally obligated to notify parents if a student is classified as a "continuing truant" – that is to say, is absent from school for three (for elementary students) or three or more class periods on three days (for middle school, junior high, and high school students) within a single year, without a valid excuse.  Minn. Stat. §§ 250A.02, subd. 3, 260A.03.  In that notification, the District is required to direct the parent to "notify the school if there is a valid excuse for the child's absences" and that there are potential legal and disciplinary consequences for continued truancy.  Minn. Stat. § 260A.03.

**B.**     **The Student Missed Several Days of School for Unrelated Medical and Non-Medical Reasons.**

The Student began attending school in the District in Kindergarten (the 2011-2012 school year).  Affidavit of Nancy E. Blumstein; Exhibit 59, page 330.[2]  She is now nine years old and in the fourth grade.  Affidavit of Jeremy Williams.  When the student was 19 months old, she was diagnosed with Anaplastic Large Cell Lymphoma. Ex. 1.  She has been in remission from this disease for almost 7 years. *Id.*

---

[2] Unless otherwise noted, all references to Exhibits refer to the Exhibits attached to Affidavit of Nancy E. Blumstein.

The Student has had a history of missing school for various, unrelated medical reasons. Ex. 59, pp. 612-613, 623-624, 704, 841-844, 849-850; Ex. 2; Ex. 3; Ex. 4. Frequently, the Parents kept her home from school for relatively minor ailments or without any specific explanation. Ex. 71, p. 18; Ex. 5. (indicating that during first grade, the Student missed school for a sore throat, a low grade temperature, and when she was not feeling well); Ex. 59, pp. 843-844 (second grade teacher recalled the Student missing school for fevers, coughs, colds, and tummy aches). The medical excuses the Parents provided for the Student's absences did not identify any single chronic or acute illness underlying the reasons for them. *See* Ex. 59, pp. 429, 496-497, 704, 843-844, 854-855, 871, 920-922; Exs. 1, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15. To the contrary, the only medical diagnoses that referenced any particular condition related to non-specific viruses, a broken toe in 2013, and pertussis – also known as whooping cough – in 2014. Ex. 16.[3]

Despite frequently missing school, the Student performed well in class. Ex. 59, pp. 699-706; Exs. 17, 18 (kindergarten); Ex. 59, pp. 330-331, 585-586, 605-609 (first grade); Ex. 59, pp. 842-843 (second grade). She did not appear to be sick in school. Ex. 19; Ex. 59, pp. 856. There was no evidence that her medical conditions affected her ability to learn or complete educational tasks when she attended school. Ex. 59, pp. 605-609, 701-706, 854, 862-869, 871-872.

On October 8, 2013, the Parents requested that the District evaluate the Student for eligibility to receive special education and related services under the Individuals with

---

[3] There is no evidence that any of the Student's absences were related to her anxiety disorder.

Disabilities Education Act ("IDEA"). Ex. 20.  At that time, the Parents explained that

they were concerned about the Student's academics. Ex. 21.  The Parents did not mention

concerns about H.J.'s absences.  Exs. 21, 22.  At the time that the request was made, the

Parent requested and was provided a copy of the School District's Section 504 policy. Ex.

21.  She indicated that, if the Student was found ineligible under IDEA, it was her

intention to request that the Student be formally evaluated for a Section 504

accommodation plan. *Id.*  On December 20, 2014, the Parents were provided a copy of a

draft evaluation report indicating that the Student did not likely qualify for IDEA

services. Ex. 23.

On January 28, 2014, before the Student's IEP Team even met to discuss the

results of the IDEA evaluation, the Parents requested that the Student be evaluated for

eligibility under Section 504. Ex. 24.  On February 3, 2014, the School District responded

to the Parents' request by speaking to the Student's father about the Student's rights

under Section 504 and the evaluation process. Ex. 25.  In addition, during this discussion,

The Student's father was provided a copy of a proposed evaluation plan; a permission to

evaluate form; a form listing the criteria for 504 eligibility; a copy of a questionnaire that

the Parents could ask the Student's medical providers to complete and provide back to the

School District; and a written copy of the Parents'/ Student's Rights under Section 504.

*Id.*

During the late winter and early spring of the 2013-2014 school year, the Student

missed a great deal of school.  Ex. 26.  The vast majority of these absences related to a

case of pertussis the Student suffered in the winter of 2013-14. Ex. 45.  In a February 4,

2014 letter and at a February 5, 2014 meeting with the Student's Parents, the Student's educators expressed their concerns about the Student's frequent absences. Ex. 59, pp. 269-272; Ex. 27; Ex. 28. In addition, the Team discussed the Parent's request for a Section 504 evaluation and explained that it needed medical information in order to conduct a comprehensive Section 504 evaluation. *Id.* During this meeting, the School District also provided the Parents another copy of their rights under Section 504 and reminded them that they needed the return their permission to evaluate and approval of the evaluation plan to the District. *Id.* The Parents indicated that they would consider the information and return permission to the School District if they decided to move forth with the evaluation. *Id.* At this meeting, the School District informed the Parents that it would require a signed medical excuse for each future medical absence. Ex. 29; Ex. 27; Ex. 28.

The Parents agreed with this request. *Id.* Because there was a doctor's note stating that the Student could be out "as needed" while recovering from pertussis, the Parents and the educators agreed that the Student would attend for a shortened school day and complete supplemental school work at home until March 5, 2014, after which she would return to school full-time. Exs. 30, 29; 31, 28. On February 10 and 13, 2014, the School District received completed questionnaires from two of the Student's medical providers. Exs. 32, 33. On March 7, 2014, the Parent provided the School District her approval of the Section 504 Evaluation Plan that she had been provided. Ex. 34.

Despite the agreement reached on February 5, 2014 meeting, the Parents continued to keep the Student home from school. Exs. 35, 36, 37, 38, 39, 40, 41, 42, 43,

44. On several occasions, the Student did not come to school at all, and no medical excuse was provided. Exs. 29, 45. Accordingly, the School District wrote the Parents on both February 27, 2014 and March 6, 2014, explaining its obligation to report truancy to the County after seven unexcused absences. Ex. 46, 29.[4] The letters urged the Parents and the Student's medical provider to meet with the District to discuss the Student's medical status. *Id.* At the due process hearing, School Principal Darci Love testified that the School "provided the Parents far more latitude" in regards of sending them this attendance letter than she "would have provided any other [Parents] in [the] School." Ex. 59, p. 261. The Parents did not respond to the District's offer to meet. Rather, the Student began to attend school full-time on March 11, 2014. Ex. 59, p. 861; Ex. 47. Once she returned to school, the Student flourished – ending the 2013-2014 school year (second grade) performing at grade level in all areas. Ex. 59, pp. 862-869; Exs. 48, 49, 50.

On March 11, 2014, School Principal wrote the Parent an email responding to an email he had sent her and explaining that, while the School would be proceeding to conduct its 504 evaluation, it had received very limited medical information to consider. Ex. 51. Later that day, the School District provided the Parents with an eligibility determination indicating that, based on the very limited information it had been provided, it had determined that the Student was not eligible for a Section 504 accommodation plan. Ex. 52. With this letter, the Parents were provided another copy of their procedural rights under Section 504 and urged to call Ms. Love if they had any questions or

---

[4] The District did not actually report the Student as truant.

concerns. *Id.* On March 12, 2014, Darci Love emailed the Student's father to tell him that she was mailing out the 504 determination. Ex. 53. In this email, Ms. Love explained that she was hopeful that the determination letter would provide Parents a better idea about the documentation/information that the Team needed to determine if the Student required an accommodation plan. Ex. 52. Ms. Love even offered to set up a meeting with the Student's medical providers, if the Parents thought that might be helpful. *Id.*

On March 13, 2014, the Parents requested an IDEA due process hearing from the School District. Ex. 54. The hearing took place on May 20, 21, and 22, 2014. Ex. 71. The hearing officer ultimately concluded that the District failed to consider the Student's medical condition when determining whether the Student qualified for IDEA services. *Id.*[5] The hearing officer, however, concluded that the District's shortcomings did not deny the Student a free appropriate education or result in any educational harm to the Student. *Id.* The hearing officer ordered the District to conduct an independent educational evaluation based on the student's medical condition. *Id.*

The Parties agreed to have Doctor Mustafa Barbour. A Pediatric Hematologist and Oncologist from Sanford Children's Specialty Clinics in Sioux Fall, S.D., complete the required evaluation. Affidavit of Jackie Budden, ¶5. Dr. Barbour completed the evaluation on July 10, 2014. *Id.* In his July 17, 2014 report, Dr. Barbour concluded that

---

[5] The May, 2014 hearing is the subject of the related lawsuit between H.J.'s parents and the District. *See, generally* Court File No. 14-CV-2114 (JRT/HB)

the Student did not suffer from an overarching medical condition related to her history of cancer that necessitated her absence from school. *Id.*, ¶6[6]

The Student has continued to be absent from school for a variety of reasons during her third and fourth grade school years (the 2014-2015 and 2015-2016 school years, respectively). Affidavit of Jeremy Williams, ¶8, 10. The Parents also continued to provide the District with medical documentation for some of those absences. *Id.*, ¶7, 11. Nothing the Parents provided, however, linked any of the Student's absences to any single diagnosis or medical condition.

**C.    The District Consistently Accommodated the Student's Known Medical Conditions.**

The District began accommodating the Student's medical conditions in kindergarten. Ex. 55. Specifically, a group of the Student's educators, the Principal, the School Nurse, and the Parents met to draft an Individual Health Plan ("IHP") for the Student. *See id.* During this meeting, the Parents did not state that the Student a chronic health condition affecting her ability to attend school. Ex. 59, p. 932. Nor did they voice concerns that the Student may be suffering long-term effects of chemotherapy, which could keep her out of school. *Id.*

The IHP initially addressed only those problems known by the District to affect the Student's performance in school: asthma and frequent stomach aches. Ex. 55. The District, however, frequently revised the IHP – and implemented other plans – to reflect

---

[6] Up until that point, the Parents had argued that the Student's cancer treatments affected her immune system and made her more prone to infections, such as upper respiratory infections, causing her to be absent from school. *See, generally,* Ex. 71.

additional medical information provided by the Parent. For instance, the Parents met with the Principal, the School Nurse, and other educators to discuss the Student's health needs on August 10, 2012 (before the start of the Student's first grade year). The Parents raised several concerns at that meeting, including the Student's need to have water at her desk, her allergies, and need for orthotics. Ex. 55; *see also* Ex. 59, p. 583.[7] The team developed a plan to respond to the Parents concerns. Ex. 56.

School officials met with the Parents during the Student's first grade year to revise the IHP. Ex. 53. Specifically, a team of educators and the Parents amended the IHP to include information related to the student's anxiety – which was disclosed to the District near the end of the Student's kindergarten year – and weakness and pronation in her ankles, which the Parents brought up at that meeting for the first time. *Id.* Likewise, the District amended the IHP during her second grade year to address the Student's asthma, anxiety, temperature and bathroom needs. Ex. 62.

The District also provided the Student with academic interventions during her kindergarten, first grade, and second grade years. For instance, the District provided reading interventions, including Title I services. Ex. 59, pp. 586-587, 605, 854; 609, 701-702, 841; Exs. 57, 58. The Student responded positively to the interventions that the District was able to implement, such that by the end of each school year, her reading was at or near grade level. Ex. 59, pp. 586-587, 605, 609, 701-703, 862-869; Exs. 57, 58, 47, 48, 49, 50.

---

[7] At no time during this discussion of the Student's did the Parent report any chronic or acute medical condition that prevented the Student from attending school. Ex. 59, pp. 583, 620, 625, 632.

On March 27, 2014, at a resolution session for the local due process hearing, the District offered, among other things, to provide the Student with a Section 504 Accommodation Plan. Budden Aff., ¶ 3. On April 11, 2014, the District reduced this offer to writing and provided it to the Parents who rejected the offer through their Legal Counsel. *Id.;* Ex. 81.

On September 5, 2014, after it received Dr. Barbour's report and at the outset of the Student's third grade school year, District representatives knowledgeable about the Student met with her Parents to develop an Accommodation Plan for the Student pursuant to Section 504 of the Rehabilitation Act of 1973 ("Section 504"). Williams Aff., ¶4. In addition to the medical conditions listed in the Student's IHP, the proposed plan also included accommodations related to all of the disabling conditions about which the School District had knowledge and a plan to educate the Student if she missed a significant amount of school. *Id.*; *see also* Ex. 75. The Parents rejected the offered plan, insisting that the Student should be permitted to be absent any time her Parents believed it to be appropriate without providing the School a medical excuse or tying it to any qualifying disabling condition. Williams Aff., ¶ 6; *see also* Ex. 63.

The Student made good progress in school during the 2014-2015 school year and continued to receive accommodations and supports from the School District pursuant to her IHP. Williams Aff., ¶ 10. In addition, throughout the 2014-2015 school-year, the School continued to reach out to the Parents to seek input from them as to how the Student's medical conditions might affect her in school and encourage them to work

cooperatively toward the development of a 504 that they would find acceptable. *Id.*, ¶ 7; *see also* Ex. 64. The Parents never agreed to these plans. *See id.*

On December 3, 2014, Principal Jeremy Williams also offered the Student the opportunity to enroll in an afterschool academic intervention program. Ex. 65. Principal Williams offered this opportunity because the Student had 24 (excused) absences at that point in the school year. *Id.*[8] The afterschool program offered "small classes with additional instruction on key learning objectives." *Id.* The Parents did not choose to enroll the Student in that program. Williams Aff., ¶ 8. Nevertheless, the Student finished her third grade year having made academic progress commensurate with her peers. Ex. 65. Her progress in math exceeded expectations for students in her grade. She also made gains in reading. *Id.*

Before the start of the Student's fourth grade year, the Parents sent the District additional medical diagnoses for the Student. Williams Aff., ¶ 11. The District responded by requesting a 504 meeting to discuss that information, the previously proposed 504 plan, and any additional accommodations that may be necessary based on the Student's medical conditions. *Id.* That meeting took place on September 17, 2015. *Id.*, ¶ 12. For the first time in the course of the discussion of a 504 plan, the Parents did not demand that the District excuse the Student from its attendance policy. *Id.*, ¶ 13. Instead, the discussion focused on the Student's anxiety and plans that the District previously proposed to assist the Student when she missed school. *Id.* The District

_____

[8] The Student was absent from school a total of 51 days during the 2014-2015 school year. Affidavit of Jeremy Williams

proposed a 504 plan at the end of that meeting.  *Id.*; *see also* Exs. 74, 79.  Like the

previous proposals, this plan addressed the Student's anxiety, lower extremity weakness,

asthma, and recurrent sinus infections.  Williams Aff., ¶ 14.  It also included a plan to

continue the Student's instruction if she missed a significant amount of school as a result

of her disabling conditions. *Id.*  Although the Parents did not sign the proposed 504 plan,

they did not voice any objection to it either.  *Id.*  The Student's teachers are currently

following the September 17, 2015 plan.  Williams Aff., ¶ 16.

## ARGUMENT

### I.    STANDARD FOR SUMMARY JUDGMENT.

Summary judgment must issue "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Matsuhita Elec. Indus. Co. Ltd. v.

Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 251-252 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  On a motion

for summary judgment, the Court views the evidence in the light most favorable to the

nonmoving party.  *Ludwig v. Anderson*, 54 F.3d 465, 470 (8th Cir. 1995).

A party moving for summary judgment needs to demonstrate that there is no

evidence to support the non-movant's claim, and this burden is satisfied by informing the

trial court why summary judgment is appropriate and identifying those portions of the

pleadings, discovery and affidavits, if any, which indicate that the non-movant cannot

support any central element of his or her claim.  *Celotex*, 477 U.S. at 323.  When a party

moving for summary judgment has met this burden, then it is the duty of the non-moving party to "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587.

The nonmoving party may not "'rest on mere allegations or denials' but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995) (*quotation omitted*). If the evidence is merely colorable or is not significantly probative, summary judgment is to be granted. *Liberty Lobby*, 477 U.S. at 250. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252. Nor is a fact "material" unless, under controlling substantive law, it is an essential element of the nonmoving party's case with respect to which he bears the burden of proof at trial. *Id.* at 248. Thus, to survive a motion for summary judgment, the nonmoving party must come forward with record evidence of specific facts for every essential element of his case so as to create a genuine issue for trial. *Celotex*, 477 U.S. at 323.

A party is entitled to summary judgment if the non-moving party fails "to establish the existence of an element essential to that party's case, and upon which that party will bear the burden of proof at trial." *Id.* at 322. This is because a "complete failure of proof concerning an essential element of the non-moving party's claim necessarily renders all other facts immaterial." *Id.* at 323.

I.     **PLAINTIFFS WAIVED THEIR DISCRIMINATION CLAIMS BY FAILING TO ASSERT THEM AS COUNTERCLAIMS IN THE IDEA ACTION.**

With certain inapplicable exceptions, Federal Rule of Civil Procedure 13 provides that a "pleading *must* state as a counterclaim any claim that – at the time of its service – the pleader has against an opposing party if the claim: (1) "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim;" and (2) "does not require adding another party over whom the court cannot acquire jurisdiction." Fed. R. Civ. P. 13(a)(1) (emphasis added). "A party that does not assert a compulsory counterclaim waives its right to bring the counterclaim *and is forever barred from asserting that claim in future litigation.*" *Schinzing v. Mid-States Stainless, Inc.*, 415 F.3d 807, 813 (8th Cir. 2005).

In similar circumstances, the Seventh Circuit Court of Appeals had "no trouble finding that [a student's claims under Section 504 and the ADA] were compulsory counterclaims in the original suit" brought by a school district under the IDEA. *Ross ex Rel. Ross v. Bd. of Educ. of Tp. High School Dist. 211*, 486 F.3d 279, 284 (7th Cir. 2007). In *Ross*, the Seventh Circuit Court of Appeals held that the parents' decision to raise ADA and Section 504 claims in a counterclaim to the District's suit was a "wise decision" because the failure to do so would mean that the claims were "thereafter barred." *Id.* Similarly, in *Orange County Health Care Agency v. Dodge*, 793 F.Supp.2d 1121 (C.D. Cal. 2011), the federal district court held that parents' claims asserting violations of the ADA and Section 504 were compulsory counterclaims to a Complaint

"seeking reversal of the ALJ's determination that Plaintiff denied Student a FAPE" under the IDEA. 793 F.Supp.2d at 1129. The results must be the same in this case.

All of Plaintiffs' claims relate to the District's evaluation, identification, and provision of services to the Student as an individual with a disability. *See, generally,* Docket No. 1. Their Complaint identifies meetings with educators, correspondence with the Student's school, and plans written by the school as the basis for their claims. *Id.*, ¶¶ 30-31, 33-34, 37-40, 41-52, 57.. All of these "transactions" and "occurrences" were at issue in the District's appeal in Court File No. 14-cv-2144. *See, e.g.,* Ex. 71 (ALJ order on appeal in Court File No. 14-cv-2144). In fact, Plaintiffs' Complaint specifically references the due process hearing that was at issue in Court File No. 14-cv-2144. Docket No. 1, ¶¶ 53. 58-60. Plaintiffs even raised their Section 504, ADA, and MHRA claims in the due process hearing at issue in Court File No. 14-cv-2144. *See* Ex. 71. There can be no doubt that Plaintiffs' disability discrimination claims in this case arise out of the same transactions and occurrences that formed the basis for the District's claims in Court File No. 14-cv-2144.

The District filed its Complaint in Court File No. 14-cv-2144 on June 23, 2014. *See* Docket No. 1 in Court File No. 14-cv-2114. Plaintiffs filed their Answer and a Counterclaim alleging violations of Minnesota State law – which they later dismissed – on August 14, 2014. *See* Docket No. 14 in Court File No. 14-cv-2144. They did not assert any disability discrimination claims in their Counterclaim. *See id.* Thus, they were "forever barred from asserting [those claims] in future litigation." *Schinzing*, 415 F.3d at

813.  This case, which was filed on October 8, 2014, is such "future litigation."  *See, generally,* Docket No. 1.  Plaintiffs' claims must, therefore, be dismissed under Rule 13.

## II.    EVEN IF THEY WERE PROPERLY BEFORE THE COURT, THE DISTRICT IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S DISCRIMINATION CLAIMS.

Disability discrimination claims under the ADA, Section 504, and the MHRA are analyzed using the same standard.  *A.P. v. Anoka-Hennepin Independent Sch. Dist. No. 11*, 538 F.Supp.2d 1125, 1139 (D. Minn. 2008).  The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Section 504 likewise prohibits disability discrimination and includes similar language.  29 U.S.C. § 794(a).  To establish a prima facie case of disability discrimination, Plaintiffs must show that:  (1) they are qualified individuals with a disability; (2) they were denied the benefits of a program or activity of the District; (3) they were discriminated against based on their disability; and (4) the Defendants acted in bad faith or with gross misjudgment.  *M.P.*, 439 F.3d at 867.  As discussed below, Plaintiffs cannot succeed on the "bad faith" or "gross misjudgment" element of their claim.[9]  Therefore, the District is entitled to judgment as a matter of law.  *Celotex*, 477 U.S. at 323.

---

[9] By limiting its arguments to those raised in this motion, the District does not waive, and expressly reserves the right to raise, any arguments related to any other element of Plaintiffs' claims.

**A.     The District did not Act with Bad Faith or Gross Misjudgment.**

Plaintiffs allege that the District discriminated against the Student by: (1) denying her a free appropriate public education; (2) failing to evaluate her and identify her as a student with a disability; (3) refusing to reasonably accommodate her medical conditions; (4) refusing to modify its attendance policies and procedures; and (5) failing to have adequate policies, procedures, etc. in place to ensure that staff did not discriminate against her. Complaint, ¶¶ 64, 66, 71, 73, 78, 80.  All of these claims relate to the Student's education and the services the District provided to her.

Because Plaintiffs are challenging the educational services provided by the District, their Section 504 claim can only succeed if they prove that the District acted with "either bad faith or gross misjudgment."  *Monahan v. State of Nebraska*, 687 F.2d 1164, 1171 (8th Cir.1982), *cert. denied sub nom; Rose v. Nebraska,* 460 U.S. 1012 (1983); *see also B.M. ex rel. Miller v. South Callaway R-II Sch. Dist.*, 732 F.3d 882, 887 (8th Cir. 2013); *M.Y. ex rel. J.Y. v. Special Sch. Dist. No. 1*, 544 F.3d 885, 888-90 (8th Cir. 2008).  The same is true of Plaintiffs' claims arising under the Americans with Disabilities Act ("ADA") and the Minnesota Human Rights Act ("MHRA").  *See B.M.*, 732 F.3d at 887 (applying bad faith or gross misjudgment standard to ADA claims); *see also Birmingham v. Omaha Sch. Dist.*, 220 F.3d 850, 856 (8th Cir. 2000) (same); *Thompson ex rel. Buckhanon v. Bd. of Sp. Sch. Dist. No. 1*, 144 F.3d 574, 580 (8th Cir. 1998) (same); *Hoekstra v. Independent Sch. Dist. No. 283,* 916 F.Supp. 941, 948 (D.Minn.1996), *aff'd*, 103 F.3d 624 (8th Cir. 1996), *cert. denied*, 520 U.S. 1244 (May 27,

1997) (same); *M.P. ex rel. K. and D.P. v. Independent Sch. Dist. No. 721*, 200 F.Supp.2d

1036, 1042-43 (D. Minn. 2002), *aff'd in part*, 326 F.3d 975 (8th Cir.2003), *rehearing and*

*rehearing en banc denied*; (8th Cir. July 3, 2003)(analysis of MHRA claim identical to

Section 504 claim); *Strock v. I.S.D. No. 281*, 2008 WL 782346, *8 (D. Minn. 2008)

(unpublished) (holding that to recover under Section 504, the ADA, or the MHRA,

plaintiffs must prove "gross misjudgment or bad faith on the part of school officials").

Indeed, it is a "well-settled principle that the *sine qua non* for claims against the District,

under [Section 504, the ADA, and the MHRA], is a finding of bad faith or gross

misjudgment on the part of school officials." *Mourby v. Indep. Sch. Dist. No. 696, Ely,*

*Minn.*, 9 F.Supp.2d 1086, 1111 (D. Minn. 1998) (citing cases).

> As the Eighth Circuit Court of Appeals expressly held:
>
> In order to establish bad faith or gross misjudgment, a plaintiff must show
> that the defendant's conduct departed substantially from accepted
> professional judgment, practice or standards so as to demonstrate that the
> persons responsible actually did not base the decision on such a judgment.

*B.M.*, 732 F.3d at 887 (internal quotation marks and brackets omitted); *see also M.Y., ex*

*rel., J.Y. v. Special Sch. Dist. No. 1*, 544 F.3d 885, 889-890 (8th Cir. 2008). This is an

exactingly high threshold to meet. "Something more than a mere failure to provide" an

appropriate education is needed to prove that a school district acted with bad faith or

gross misjudgment. *Monahan v. State of Neb.*, 687 F.2d 1164, 1170 (8th Cir. 1982); *see*

*also Smith ex rel. Townsend v. Special Sch. Dist. No. 1 (Minneapolis)*, 184 F.3d 764, 769

(8th Cir. 1999) (holding the school district's provision of program that was not well

suited for addressing student's learning disability needs was not bad faith or gross

misjudgment); *Hoekstra*, 103 F.3d 624 (holding that school's delay in providing tutoring and elevator key, which caused student's education to suffer, did not constitute bad faith or gross misjudgment).

Specifically, to demonstrate bad faith or gross misjudgment, a plaintiff must present "evidence regarding what an accepted professional judgment would have been under the circumstances [and] how the [school's] conduct substantially departed from such a judgment." *B.M.*, 732 F.3d at 888. The failure to evaluate a student under Section 504 in a timely manner does not reach this level. *See id*. Nor does a mere failure to accommodate a student's disability establish bad faith or gross misjudgment on the part of a school. *Brantley v. Indep. Sch. Dist. No. 625, St. Paul Public Schools*, 936 F.Supp. 649, 657 (D. Minn. 1996) (citing *Monahan*, 687 F.2d at 1170). Indeed, "[n]o amount of claimed violations of the Federal regulations will relieve the Plaintiff from his burden to show bad faith or gross misjudgment." *Mourby*, 9 F.Supp.2d at 1111; *see also B.M.*, 734 F.3d at 887 (holding that mere non-compliance with statutory requirements, professional judgment, practice or standards does not meet the bad faith or gross misjudgment standard). To the contrary, the alleged failure to violate Section 504, the ADA, or the MHRA must "deviate so substantially from accepted professional judgment, practice, or standards as to demonstrate that the defendant acted with wrongful intent." *B.M.*, 732 F.3d at 887;[10] *see also M.Y., ex rel., J.Y. v. Special Sch. Dist. No. 1*, 544 F.3d 885, 890 (8th Cir. 2008); *Birmingham*, 220 F.3d at 857 (holding that school was attempting to act

_____

[10] Not even negligent acts by school officials rise to this level. *Bradley*, 301 F.3d at 956.

in disabled student's best interests when it decided to graduate the student early, and therefore it did not act in bad faith or with gross misjudgment).

> 1. *The Parents do not allege that the District acted in bad faith or with gross misjudgment.*

In their Complaint, the Parents allege that the District failed to evaluate the Student under Section 504 until February 2014, that the District's evaluation was flawed, and that the District erroneously determined that the Student was not entitled to receive a 504 plan related to her medical conditions. *See, generally,* Docket No. 1. Plaintiffs, however, do not allege that the District acted in bad faith or with gross misjudgment. Nor do they identify any "accepted professional judgment" that would have pertained under the circumstances, nor do they allege that the District's conduct "substantially departed" from any such standard, as required to support a finding that the District acted in bad faith or with gross misjudgment. *B.M.*, 732 F.3d at 888. This failure is fatal to Plaintiff's disability discrimination claims. *See, e.g., I.E.C. ex rel. J.R. v. Minneapolis Pub. Sch., SSD No. 1*, 970 F.Supp.2d 917, 931 (D. Minn. 2013) (dismissing Section 504 claim for lack of "any factual allegations" supporting claim of intentional discrimination "much less that [any such discrimination] was based on bad faith or gross misjudgment"); *see also J.E.B. ex rel. C.L.L. v. Indep. Sch. Dist. No. 720*, 2007 WL 1544611, *5 (D. Minn. 2007) (unpublished) (dismissing discrimination claims under Section 504, the ADA, and

the MHRA for failure to allege that defendant acted in bad faith and failing to allege facts to support determination that the decision was a gross misjudgment).[11]

For instance, Plaintiffs allege that they provided the District with medical information regarding the Student's anxiety on March 30, 2012 and that the District nevertheless failed to evaluate her under Section 504 until February 2014. Docket No. 1, ¶¶ 30, 39-42. Plaintiffs, however, also admit that the District provided the Student with an IHP – as requested by her doctor – to address that condition at the beginning of the next school year. Docket No. 1, ¶41. There is no allegation that the IHP did not adequately meet the Student's needs, as related to the conditions the Parents identified.

Likewise, Plaintiffs devote a significant portion of their Complaint to arguing that the District discriminated against them by requiring the Parents to provide a signed doctor's note when they kept the Student home from school for medical reasons, including a myriad of upper respiratory infections. Docket No. 1, ¶¶ 43, 49-50. The District, however, has a statutory obligation to ensure that students miss school only for legitimate reasons and to treat an absence as excused only when it is satisfied that the excuse is legitimate. Minn. Stat. § 122A.22, Subd. 12. There can be little doubt that attempting to meet his obligation – and keep students attending school regularly – is a legitimate purpose. "Good faith attempts to pursue legitimate ends" do not constitute bad

---

[11] Plaintiffs' allegation that the District's actions were "intentional, grossly recklessly and deliberately indifferent to [the Student's] rights" does not satisfy the pleading requirements. Rather, plaintiffs must plead sufficient facts to support a showing of bad faith or gross misjudgment. *See, e.g., B.M.*, 732 F.3d at 888; *see also Larson ex rel. Larson v. Indep. Sch. Dist. No. 361*, 2004 WL 432218, *15 (D. Minn. 2004) (unpublished) (dismissing claims where plaintiffs "failed to plead any facts that lead to an inference of bad faith or gross misjudgment on the part of the School District")

faith or gross misjudgment. *Hoekstra*, 916 F.Supp.2d at 949. Thus, even if the District somehow violated the Student's rights by insisting that the Parents provide documentation to prove that she was not truant, such conduct is not actionable under Section 504, the ADA, or the MHRA. *See, e.g., id.*

Finally, nowhere in their Complaint do Plaintiffs identify any "standard of professional judgment" that they allege applies to the District's actions or that the District substantially departed from that standard. An alleged violation of the law, without more, does not constitute bad faith or gross misjudgment. *Mourby*, 9 F.Supp.2d at 1111; *see also B.M.*, 734 F.3d at 887. Likewise, Plaintiffs do not allege any facts to support a finding that District officials "substantially departed" from its procedures, to the point where their decision did not actually reflect professional judgment, as is necessary to support an allegation of bad faith or gross misjudgment. *B.M.*, 732 F.3d at 887.

        2.       *There is no evidence to support any allegation that the District acted in bad faith or with gross misjudgment.*

Even if Plaintiffs had properly pleaded a claim that the District acted in bad faith or with gross misjudgment, the District is still entitled to judgment as a matter of law on their discrimination claims. There is no evidence to support a finding that the District acted in bad faith or with gross misjudgment towards the Parents or the Student.

As the Eighth Circuit Court of Appeals recently held, bad faith or gross misjudgment requires some wrongful intent on the part of the school officials. *B.M.*, 732 F3.d at 887. "Good faith attempts to pursue legitimate ends" do not rise to the level of actionable wrongful intent. *See Hoekstra*, 916 F.Supp.2d at 949.

Here, evidence does not support even a reasonable inference that the District substantially deviated from professional standards or acted with wrongful intent towards the Student. To the contrary, the evidence supports only one conclusion: since she entered school, the District made significant efforts to provide the Student support services and interventions intended to accommodate her health needs and to address any educational needs with which she presented. *See, e.g.,* Ex. 55.

There is no question that these accommodations and interventions were successful in addressing the Student's medical needs at school and permitted her to make educational progress consistent with her peers. Ex. 65; *see also* Williams Aff., ¶ 10. The significant educational progress that the Student made each school year, even in light of her frequent absences, is testament to the good faith efforts that the District made to support the Student.

The Plaintiffs' Complaint focuses on three main areas. First, they take issue with the fact that the School District wrote the Parents on March 6, 2014 about the Student's absenteeism and its obligation to file truancy. *See* Docket No. 1, ¶ 43, 47-48, 52. Second, they focus on the initial conclusion that the Student did not qualify as a student with a disability under Section 504. *See id.*, ¶ 51. Third, they allege that the Section 504 plan that the District offered was insufficient to meet the Student's needs. None of these actions are sufficient to meet the bad faith or gross misjudgment standard.

First, the fact that the School District did not feel that it could continue to ignore its obligations under the Minnesota Compulsory Instruction Act does not evince bad faith or gross misjudgment. Instead, this action reflects concern about the Student and her

ability to obtain an appropriate education. By any measure, being concerned that a student's education does not suffer because of frequent absences from school is a legitimate purpose, as is complying with legal obligations to which the District is subject. Thus, the school officials' conduct cannot be construed to constitute bad faith or gross misjudgment. *See, e.g., Heidemann v. Rother*, 84 F.3d 1021, 1031 (8th Cir. 1996) (recognizing school's legitimate interest in "providing appropriate care for [a student] as part of her public school education]); *see also Bradley ex rel. Bradley v. Ark. Dep. Of Educ.*, 443 F.3d 965, 977 (8th Cir. 2006) (holding that a principal's reporting of truancy pursuant to state law was not pretext for unlawful discrimination), *T.F., D.F. and T.S.F. v. Fox Chapel Area School District*, 2013 WL 5936411, 15-16 (D. PA, 2013) (unpublished) (holding that reporting disabled student truant was not evidence of retaliation), *Sudekamp v. Fayette County Bd. of Educ.*, 2005 WL 2137739, *3-4 (E.D. KY, 2006) (unpublished) (recognizing that following truancy laws with respect to disabled student is a legitimate, non-discriminatory action).[12]

Second, while erroneous, Ms. Love's statement that the Student did not qualify as disabled under Section 504 does not meet the bad faith, gross misjudgment standard. Despite Ms. Love's misstatement, the School District recognized that the Student

---

[12] It is also important to view the District's actions in sending this letter in context. The District did not actually report the Student for truancy. The District simply sent the Parents a letter informing them about the Minnesota Compulsory Instruction Act and its reporting requirements. Exs. 29, 46. As Darci Love testified, this letter was sent to the Parents much later than the parents of other Parkview students with repeated absences from school have received similar warning letters. Ex. 59, p. 261.

qualified as an individual with a disability and had been providing her accommodations for her medical conditions since she began attending kindergarten. *See, e.g.,* Ex. 55. Moreover, the School District corrected Ms. Love's error by offering the Student a 504 plan once it became aware of it. Budden Aff., ¶ 3. Finally, a simple review of Ms. Love's March 11, 2014, letter and accompanying email to the Parent demonstrates the intention behind the letter; namely a concern about the Student and a willingness to consider any additional medical information that the Parents were willing to provide. Ex. 46.

This conduct does not portray wrongful intent. Ms. Love's conduct was simply, at most, a mistake that was rectified by the School District soon after. A failure to appropriately interpret or comply with a law does not meet the bad faith gross misjudgment requirement. *B.M.*, 732 F.3d at 888.

In *B.M.*, a school repeatedly suspended a student and failed to accommodate his disabilities with an appropriate Section 504 plan. *Id.* In upholding a district court's decision to grant the school district's summary judgment motion, the Eighth Circuit ruled that bad faith or gross misjudgment had not been established because the plaintiffs had failed to put forth any evidence that the school's conduct departed so substantially from accepted practice, judgment or standards as to demonstrate wrongful intent. *Id.* Here, as in *B.M.,* the School District is entitled to summary judgment on Plaintiffs' discrimination claims because they have failed to produce evidence that demonstrates that the School District acted in bad faith or with gross misjudgment.

**B.    The Deliberate Indifference Standard is Not Applicable Here. However, Even if it Was, Plaintiffs Have Failed to that Meet that Standard.**

The Eighth Circuit Court of Appeals has "consistently held that where alleged ADA and § 504 violations are based on educational services for disabled children, the plaintiff must prove that school officials acted in bad faith or with gross misjudgment." *B.M.*, 732 F.3d at 887 (quoting *Birmingham*, 220 F.3d at 856). Nevertheless, Plaintiffs appear to allege that a lower "deliberate indifference" standard is applicable to their claims. As discussed above, such a contention is directly contrary to applicable law. *See, e.g., B.M.*, 732 F.3d at 887. In any event, however, Plaintiffs' claims still fail as a matter of law. The same evidence that demonstrates that the District did not act in bad faith or with gross misjudgment amply demonstrates that it was not deliberately indifferent to the Student's medical conditions.

Deliberate indifference "requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood." *A.P.*, 538 F.Supp.2d at 1147 (citations omitted). A showing of negligence is insufficient to establish deliberate indifference. *Id.* "Rather, a defendant is deliberately indifferent only if he acts with 'conscious disregard' for a plaintiff's rights." *Id.* "Such conscious disregard exists only if either (1) the defendant actually knows that its actions will violate the plaintiff's rights, or (2) such a violation is the 'plainly obvious consequence' of the defendant's actions." *Id.*

In this case, the undisputed facts establishes that there was no conscious disregard for the Student's rights. There is no evidence that any District employee knew that he or

she was violating the Student's rights or that it was obvious that his or her actions were doing so. To the contrary, the evidence amply demonstrates that the District was attempting to accommodate the Student as best as it knew how, based on the information available to it.

Regardless of an arguably flawed initial eligibility determination, the District continued to provide the Student the supports in her IHP. As it became aware of additional medical needs, the District amended the IHP and, ultimately, the 504 plan, to reflect them. This conduct does not amount to deliberate disregard for the Student's rights. To the contrary, the School District was attempting to work cooperatively with the Parents for purposes of providing the Student a sound and appropriate education consistent with her individual needs. Its alleged failure to formally evaluate the Student sooner, its allegedly inappropriate initial determination, which, Plaintiffs admit, was based on insufficient medical information, does not even come close to the intentional disregard of the Student's rights that is required to meet the deliberate indifference standard. *See, e.g., Fox Chapel*, 2013 WL 5936411 at * 15-16.

Moreover, the Office of Civil Rights has advised school districts that, "[w]here a student with a disability has a health plan in place in order to address the impact of a disability" a student is considered "to be receiving services under Section 504, whether or not the health plan is formally incorporated into an IEP or Section 504 plan." *Prince William County (VA) Public Schools,* 57 IDELR 172 (OCR, 2011). As that guidance was in effect at the time the District first adopted the Student's IHP, it could not have been obvious that accommodating the Student through an IHP violated Section 504.

### D. The Student did not Suffer any Educational Harm as a Result of the District's Alleged Discrimination.

"The pertinent obligation of a school district under Section 504 is the same as its obligation under the IDEA: to provide disabled students with a free appropriate public education." *C.N. v. Willmar Public Schools*, 2008 WL 3896205, *5 (D. Minn. 2008) (unpublished) (quoting *Fick ex rel. Fick v. Sioux Falls Sch. Dist. No. 49-5*, 337 F.3d 968. 970 (8th Cir. 2003) (internal brackets omitted). In fact, IDEA is actually more prescriptive and requires the provision of a greater amount of education than does Section 504. Consequently, one way of complying with Section 504 is to comply with the requirements of IDEA. *See* 34 CFR § 104.33 (b)(2).

Plaintiffs' allegations concerning the Student's denial of education in this lawsuit are the same as those made in the Plaintiff's due process hearing complaint. *See* Docket No. 1. In his June 10, 2014 Order, ALJ Mortenson held that the Student made educational progress and suffered no educational loss with only the provision of non-special education interventions. *See* Ex. 71. As this Court has affirmed the Administrative Law Judge's decision, it must render a determination here which is consistent with its prior ruling and find that the Student has suffered no educational loss under Section 504.

### E. The District Reasonably Accommodated the Student's Medical Conditions.

From the time the Student enrolled, the District accommodated every medical condition the Parents identified. Those accommodations allowed the Student to make significant progress in school. The only accommodation the District ever denied the

Parents was the opportunity to keep the Student out of school without a medical excuse. That request was not reasonable. The alternatives that the District offered (i.e. after school homework assistance, Title I services) however, were reasonable. There is no legal or factual basis for concluding that the District failed to accommodate the Student, much less that it did so in bad faith or with gross misjudgment.

The Student first received an IHP in her kindergarten year. Ex. 55. That IHP contained accommodations for all of the medical conditions that the Parents disclosed to the District. The District revised the IHP in the Student's first grade and second grade years to reflect the additional medical conditions the Parents identified. Exs. 53, 62. Plaintiffs do not appear to assert that the accommodations listed in the IHP were insufficient to allow the Student to perform in school. Indeed, any such allegation would be contrary to the demonstrable progress the Student made each year. Exs. 47, 48, 49, 50; *see also* Williams Aff., ¶ 10.

Instead, Plaintiffs focus entirely on the District's decision to follow State law and its attendance policy by requiring the Parents to provide a medical excuse when the Student was absent from school. Docket No. 1, *See, e.g.,* ¶¶ 40-50. At no time, however, did Plaintiffs ever identify a disabling condition that required the Student to miss school. To the contrary, all of the Student's absences appeared to be from unrelated conditions. Ex. 45. There was simply no basis upon which the District could conclude that the Student required an accommodation to the attendance policy. In fact, not even the

independent evaluation conducted after the due process hearing revealed such a connection. *See, e.g.,* Budden Aff., ¶ 6.[13]

Moreover, the District's enforcing its attendance policy was nothing more than an attempt to verify that the Student's absences were indeed due to a medical condition. Exs. 29, 46. The District never refused to excuse an absence that was determined to be related to a medical condition of any kind. The District would have been unable to ascertain whether it could excuse an absence for medical reasons if it had granted that request.

For that reason, the Parents' request for unilateral authority to keep the Student out of school without medical excuse was unreasonable. The District has a statutory duty to keep track of valid excused absences and inform parents when their students are truant. Minn. Stat. §§ 250A.02, subd. 3, 260A.03. It enforces that obligation for all students. Ex. 59, p. 261. The District would have been unable to meet that obligation had it allowed the Parents to keep the student home without medical excuse. Therefore, granting such a request would have been a fundamental alternation in the District's operations, making the requested accommodation unreasonable. *See DeBord v. Bd. of Educ. of Ferguson-Florissant Sch. Dist.*, 126 F.3d 1102, 1106 (8th Cir. 1997) (identifying "fundamental alteration" in program as a basis for determining whether accommodation is unreasonable).

---

[13] To the extent the Parents disagree with this evidence, such disagreement does not constitute evidence of bad faith or gross misjudgment. *Smith ex rel. Townsend v. S.S.D. No. 1 (Minneapolis)*, 184 F.3d 764, 769-770 (8th Cir. 1999).

Once it became aware of an alleged disability that required the Student to miss frequent amounts of school, the District did offer to accommodate it. *See, e.g.,* Exs. 74, 79; *see also* Williams Aff., ¶ 14. Even before then, the District offered the Student additional services, including specialized small group classes after school, to help her make up for absences. *See, e.g.,* Williams Aff., ¶¶ 8-9. These accommodations, while not necessarily requested by the Parents, were reasonable, especially considering that the Student made educational gains after receiving the interventions. *See* Ex. 45.

Finally, the Student's educators believe that it is important for the Student to come to school whenever possible and that allowing her to stay home without a valid medical excuse could cause her educational harm. *See, e.g.,* Williams Aff., ¶ 6. While the Parents may disagree, there is no evidence that the District's decision was based on anything other than a desire to help the Student progress in school. The District's decision does not demonstrate wrongful intent, bad faith or gross misjudgment and, therefore, is not a violation of Section 504, the ADA, or the MHRA. *See, e.g., B.M.*, 732 F.3d at 888.

**F.  The District did not Retaliate against Plaintiffs.**

In their Complaint, Plaintiffs claim that the District retaliated against them in violation of Section 504, the ADA, and the MHRA when it "threatened educational neglect and truancy" during the period when they were seeking to enforce the Student's rights under these laws. Docket No. 1, ¶¶ 67, 74, 81. Their retaliation claim is based that the fact that the District wrote the Parents a letter explaining its concerns regarding the

Student's attendance and the District's obligations under the Minnesota Compulsory Instruction Act. *See id.* There is simply no merit to this claim.

In order to establish a case of retaliation under Section 504, the ADA, and the MHRA, Plaintiffs must show that they were engaged in a protected activity; 2) that the School District took some adverse action; and 3) that there was a causal relationship between the activity and the School District's action. *Bradley,* 433 F. 3d at 976.

Plaintiffs cannot establish such a prima facie case. Specifically, they fail to demonstrate that the District took an adverse action against them. The District did not threaten the Parents with educational neglect, nor did they threaten truancy as the Parents allege. A simple review of the February 27, 2014 and March 6, 2014 letters in question confirms that the District expressed concerns and explained its obligations regarding attendance. Exs. 29, 46. The District did not threaten anything. It did not take any further action. Instead, it excused the Students' absences and continued to accommodate her.

In those letters, Principal Love merely informed the Parents of the School's concerns about the Student's attendance and explained the District's obligation under the Minnesota Compulsory Instruction Act. No further action was taken as a result. They were simply informative letters provided to the Parents for purposes of encouraging them to more fully communicate with the School District regarding the Student's health status and explaining why it was necessary for the School District to have this information. *Id*. However, even if the School District had filed a truancy action, that action would still not have constituted an adverse action when the School District was responding to H.J.'s

32

unexcused absences and was adhering with state truancy laws in so filing. *Arkansas Department of Education,* 433 F. 3d 965 at 977; *See also Fairfax County*, 2006 WL 6209927.

Moreover, adherence to the State truancy law is, indisputably, a legitimate non-discriminatory action. *See id.* There is no evidence that the District's attempts to follow the law were pretext for discriminating against the Student or the Parents on any basis. To the contrary, Principal Love sends similar letters to other Parents and, in fact, was more lenient with the Parents than she would have been with other parents. Ex. 59, p. 261. In the absence of pretext, the District's legitimate, non-discriminatory action entitles the District to summary judgment on Plaintiffs' claims. *See, e.g., McDonnel Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973) (outlining burden shifting framework).

## CONCLUSION

The District did not discriminate against Plaintiffs or fail to provide the Student with a reasonable accommodation related to any of her known medical conditions. To the contrary, the District provided her accommodations that it believed would help her succeed in her education. There is no evidence to support a finding that the District acted with the bad faith or gross misjudgment necessary to support the Parents' claims. Nor is there any evidence that the District retaliated against Plaintiffs for any reason. There are no genuine disputes of material fact and, for the reasons discussed herein, the District is entitled to judgment as a matter of law.

Respectfully submitted,

**RATWIK, ROSZAK & MALONEY, P.A.**


Dated: October 30, 2015         By: /s/Nancy E. Blumstein
                                    Nancy E. Blumstein
                                    Attorney Reg. No. 227638
                                    Christian R. Shafer
                                    Attorney Reg. No. 387947
                                    Ashley R. Geisendorfer
                                    Attorney Reg. No. 393109
                                    730 Second Avenue S, Suite 300
                                    Minneapolis, MN 55402
                                    Telephone: (612) 339-0060
                                    Fax: (612) 339-0038
                                    neb@ratwiklaw.com
                                    crs@ratwiklaw.com
                                    age@ratwiklaw.com

                                    **ATTORNEYS FOR INDEPENDENT SCHOOL DISTRICT NO. 413, MARSHALL**

RRM:    216358

34