UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Civil File No. 14-CV-4182 (JRT/HB)

H.J., by and through her Parents and
Natural Guardians, A.J. and M.N.,

                    Plaintiffs,

v.

**PLAINTIFFS' MEMORANDUM IN
OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT**

Independent School District, No. 413,
Marshall,

                    Defendant.

---

## INTRODUCTION

Defendant Marshall Public Schools ("Marshall") moved the Court for Summary

Judgment on the claims Plaintiffs' brought to redress the rights of H.J. ("H.J." or "Student") as a

student with a disability under Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29

U.S.C. § 794, and its implementing regulations at 29 C.F.R. Part 104, as amended, Americans

with Disabilities Act ("ADA"), 42 U.S.C. § 12132, 42 U.S.C. § 1983 ("Section 1983"), and the

Minnesota Human Rights Act, § 363A.03 (MHRA) against the Marshall Public Schools

("District").

H.J. is a nine year old cancer survivor.  She contracted stage IV anaplastic large cell

lymphoma at 19 months of age.  After one year of chemotherapy her physicians declared her in

remission.  However, as a result of her chemotherapy treatments, H.J. experienced long term side

effects.  The side effects diagnosed by physicians include generalized anxiety disorder, bilateral

lower extremity peripheral neuropathy, constipation, urinary tract infections (resolved), gastro-

esophageal reflux, insomnia, anxiety, and recurring upper respiratory infections.  H.J. has also

been diagnosed with Asthma.  Plaintiffs have asked Marshall to evaluate H.J's chronic medical

conditions as they affects her performance and attendance at Marshall. Marshall's response from the first notification in September 2012 to the present is that H.J. is not suffered from any medical condition that affects her ability to attend school. Plaintiffs have asked time and again for Marshall to undertake its affirmative duties to evaluate and provide modifications and accommodations for H.J.'s disabling conditions by evaluating and providing H.J. with a Section 504 plan or individualized education program ("IEP"). This issue has been at the forefront of this litigation and is central to the claims that Marshall refused to evaluate and provide reasonable accommodations for H.J.'s documents chronic health conditions. In addition, Plaintiffs brought claims under the ADA, Section 504 and MHRA for claims of disability discrimination and retaliation. The claims for disability discrimination is based on Marshall's refusal to evaluate and accommodate H.J. because of her chronic medical conditions, thereby, depriving her of her right to equal access and benefit to the education program. In addition, rather than undertakes its responsibilities under the ADA, Section 504 and MHRA, Marshall staff retaliated by threatening the parents with truancy and educational neglect proceedings at the same time that Plaintiffs were participating in the flawed identification and evaluation process that Marshall did provide. Indeed, rather than evaluate and provide services for H.J., Marshall held Plaintiffs to a standard that was not applied to other students and was inconsistent with Marshall's policies and procedures for documentation of absences. When the Plaintiffs attempted to comply with the extraordinary documentation by providing medical documentation each time H.J. was sick, Marshall accused the Plaintiffs' of physician shopping. Those allegations were the last straw for a family trying for nearly three (3) years to have H.J. evaluated and accommodated without success.

Marshall argued that Plaintiffs failure to accommodate, disability discrimination and

retaliation claims should be dismissed because 1) Plaintiffs' waived their right to bring any claims under the ADA, Section 504 or MHRA because it was a compulsory counterclaim in the Marshall's appeal of the administrative decision; 2) Plaintiffs' failure to accommodate, and disability discrimination and retaliation claims do not meet the *Monahan* bad faith and gross misjudgment standard; and 3) Plaintiffs have failed to allege facts sufficient to sustain claims of retaliation.

Defendant argued, as it has throughout the special education administrative hearing and appeal, that H.J. is not a child with a disability entitled to protections of any state or federal law and does not suffer from any medical conditions that adversely affect her attendance at school. Instead, according to Defendants, Plaintiffs are simply keeping their child at home without a valid or legitimate reason.

Since H.J.'s kindergarten school year in Marshall Public Schools, Plaintiffs have attempted to obtain from Marshall an evaluation, identification and modifications and accommodations under Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400, *et seq.*, and its implementing regulations 34 C.F.R. Part 300, and/or Section 504 of the Rehabilitation Act of 1973 (Section 504), 29 U.S.C. § 794, and its implementing regulations at 29 C.F.R. Part 104, as amended.[1]

Plaintiffs requested a special education and administrative hearing under the IDEA. In the same complaint, Plaintiffs raised disability discrimination and retaliation claims under

---

[1]  The ADA and the Rehabilitation Act provide similar protections to disabled individuals, as the courts often note. *See, e.g., Wojewski v. Rapid City Reg'l Hosp., Inc.,* 450 F.3d 338, 345 (8th Cir. 2006) ("The Rehabilitation Act and Title I of the ADA are interchangeable in many respects."); *Layton v. Elder,* 143 F.3d 469, 472 (8th Cir.1998) ("The rights, procedures, and enforcement remedies under Title II [of the ADA] are the same as under section 504 [of the Rehabilitation Act]."). And the Eighth Circuit has concluded that the MHRA provides essentially the same protections as the ADA. *Somers v. City of Minneapolis,* 245 F.3d 782, 788 (8th Cir.2001) ("Claims under the MHRA are analyzed the same as claims under the ADA."); *Breiland v. Advance Circuits, Inc.,* 976 F.Supp. 858, 864 (D.Minn.1997).

Section 504. The administrative law judge (ALJ) dismissed all non-IDEA without prejudice because he lacked subject matter jurisdiction over the claims. *H.J. v. Indep. Sch. Dist.*, OAH 5-1300-31365MDE 14-016-H, Third Pre-hearing Order –JM (SEA April 11, 2014)[Certified Inventory No. 8][14-cv-2114]. Once those claims were dismissed, Marshall vigorously and repeatedly objected to the introduction of any evidence related to non-IDEA claims. Ex. 59, *Trans. 65-66, 139 and 141.*

Thereafter, Plaintiffs brought claims through a verified complaint (ex. 101)[Docket No. 1] under the Acts for Marshall's failure to identify, evaluate and accommodate H.J. as a student with a disability, as well as Marshall's actions of disability discrimination and retaliation. The special education administrative hearing complaint and the complaint before the Court are based on Marshall's refusal to undertake its affirmative duties to identify, evaluate and accommodate H.J.'s disabling conditions. Rather than undertake the affirmative duties, Plaintiffs alleged that Marshall retaliated by threatening truancy, education neglect and asserting that the Plaintiffs were *physician-shopping* rather than acting in the best interests of H.J.

## STATEMENT OF DISPUTED FACTS

Plaintiffs' verified Complaint provide the Court with factual averments that contradict Marshall's facts and are under contest. The Court in the related matter (14-cv-2144) also reached factual findings on many of the facts Defendant now contests. Plaintiffs argue that Defendant is estopped from re-litigating the finding that Marshall did not comprehensively evaluate H.J.'s chronic health conditions and the impact those impairments had on her ability to attend, participate and derive benefit from her public instruction. Defendant identified in its brief its uncontested facts. Inclusive were factual averments regarding Marshall's actions related to the evaluation and modification and accommodation of H.J. within the elementary setting. The

Complaint, as well as the facts represented below, sets forth the material facts that require resolution from the trier of fact.

H.J. is a nine year old cancer survivor. *Plaintiffs' Verified Complaint* (*Complaint*)[Docket No. 1] at p. 1. She contracted stage IV anaplastic large cell lymphoma when she was 19 months of age. *Id*. She started chemotherapy treatment on September 6th 2007 and completed therapy on August 8, 2008. *Id*. She was subsequently diagnosed with stage IV anaplastic large cell lymphoma in remission. *Id*. She is seen annually at the University of Minnesota, Pediatric Hematology-Oncology ("Oncology") for follow up care. *Id*. As a result of her chemotherapy treatments, H.J. experienced some long term side effects from the chemotherapy medication. *Id*. The affects included generalized anxiety disorder, bilateral lower extremity peripheral neuropathy, constipation, gastro-esophageal reflux, insomnia, anxiety, and upper respiratory infections (URIs). *Id*. H.J. was also diagnosed with Asthma. *Id*.

From the time that H.J. began attending public school, her parents and medical practitioners have seen URIs that begin in November of each year. *Id*. The URIs become worse over time until surgeries in April or May were required to resolve them. *Id*.

When H.J. began attending school full time in kindergarten, she was experiencing significant anxiety around separating from her parents, difficulty regulating her body temperature, inability to concentrate, severe constipation, as well as absences associated with recurring fevers and infections. *Id*. From the time that H.J. began to experience absences related to her health in kindergarten, the Plaintiffs were requesting any assistance Marshall could offer to help H.J. and her medical conditions as it affected her education.

Because of H.J.'s anxiety and absences, Plaintiffs brought her to the University of Minnesota Pediatric Neuropsychology ("U of M Pediatric Neuropsych") for a neuro-

psychological evaluation. On March 30, 2012, Drs Kelly E. King, Ph.D., L.P., and Rachel C. Weber, Ph.D. completed a pediatric neuropsychological evaluation and concluded that H.J. suffered from generalized anxiety disorder, which Dr King identified as a long term effect of her chemotherapy. Ex. 1. Dr King recommended that H.J.'s parents consult with a child/adolescent psychiatrist for medication management and continue her psychotherapy services. *Id*. The Plaintiffs immediately followed this advice and contacted Jari Johnson for H.J.'s therapy. Thereafter, Dr Nicole Christianson, MD became H.J.'s child psychiatrist and continued to work with the Plaintiffs. *Complaint* at ¶ 30. In addition to H.J.'s anxiety, Dr King also recognized that H.J. was struggling with recurring infections and was missing school as a result. Ex. 1. Dr King's recommendations specific to the school setting included the development of an Individual Health Plan (IHP) to provide her with medication reminders in school for her acid reflux, asthma, and adaptations in attendance policies to address her absences due an impaired immune system, as well as the development of a common criteria for school absences. *Id*. To address H.J.'s anxiety, Dr King recommended a Section 504 plan and modifications and accommodations to the school setting, weekly meetings with a school social worker and consistent communications between the school and parents. *Id*.

As the district court found in the related case, the Plaintiffs provided Marshall with the Pediatric Neuropsych report. *Marshall Public Schools v. H.J.*, et al., No. 14-cv-2114-JRT, slip op. (D. Minn. August 11, 2015)("Order") at p. 3 – 4. Despite the receipt of the Neuropsych Evaluation, Marshall's educators did not initiate an evaluation of H.J. or provide her with a Section 504 Plan. With no response from Marshall regarding H.J.'s anxiety and illnesses, the Plaintiffs asked that they be permitted to accompany H.J. to her classroom to address H.J.'s anxiety that often manifested at the beginning of the day during separation. *Complaint* at ¶ 3.

Other parents often accompanied their children to the classroom in the mornings. *Id*. Marshall permitted the Plaintiffs to do so but insisted that the Plaintiffs reduce the distance they were bringing H.J. each week without consideration to her diagnosis of Generalized Anxiety Disorder ("GAD"). *Id*. It was not until after Jari Johnson ("Johnson") requested in writing that the Plaintiffs accompany H.J. to her class room were her parents permitted to resume coming into the school. *Id*.

After the Neuropsych Evaluation did not induce Marshall to evaluate and accommodate H.J.'s then identified disabling condition, Pediatric Nurse Practitioner Jill Lunsford Lee ("Lee") with the University of Minnesota, Pediatric Hematology-Oncology Long Term Follow Up Program ("Oncology") wrote to Marshall on September 18, 2012 confirming that H.J. had long term side effects from the chemotherapy that included constipation, bilateral lower extremity peripheral neuropathy (neuropathy), recurrent UTIs resolved, gastro-esophageal reflux, insomnia and anxiety. Ex. 6. To address the neuropathy, Lee recommended H.J. receive physical therapy in school and accommodations in her footwear. Lee wrote that H.J.'s generalized anxiety could manifest physically with headaches and upset stomach and should be addressed through modification to her class day, and a plan developed with H.J.'s counselor/therapist to address the physical manifestations of anxiety in the school setting. Plaintiffs provided the Defendant with a copy of the Lee correspondence as the Court in the related case found. *Order* at 4.

H.J. was seen again by U of M Oncology on August 23, 2013 for a follow up appointment and Lee again identified in writing to Marshall that H.J.'s chronic and acute late effects of the chemotherapy including constipation, bilateral lower extremity neuropathy, recurrent UTIs resolved, gastro-esophageal reflux, insomnia and generalized anxiety. Exs 7 and 8. Lee noted in the report that H.J. required surgery in May 2013 to resolve the fevers and sinus

infections.  *Id.*

After Marshall did not respond to the Neuropsych Evaluation and Lee's second correspondence, Plaintiffs requested a special education evaluation in writing to Marshall on October 8, 2013.  Defendant Marshall initiated and completed the IDEA evaluation without meeting with the parents (*Order* at 9) or completing an assessment of H.J.'s identified medical conditions as those conditions affected her performance and attendance at school.  Instead, Marshall provided a determination that H.J. did not meet criteria for special education services. *Id.*  According to the evaluation, Marshall did not take into consideration H.J.'s chronic health conditions as identified by the Neuropsych Evaluation and Lees correspondence and H.J.'s eligibility under Other Health Disabled ("OHD").  *Id.* This finding was initially made by the administrative law judge and affirmed by the Court on appeal.  *Orde*r at 9.  As the ALJ found and the Court affirmed, Marshall noted in its evaluation that H.J. missed significant school but there was no information regarding her chronic health conditions including the recurrent upper respiratory infections and her absences in the evaluation.  *Order* at 17.

In addition to the outside medical professionals and parents asking for a comprehensive assessment of H.J.'s chronic medical conditions, the incomplete Marshall evaluation noted a discrepancy between H.J.'s intellectual functioning and her academic performance in reading. Ex. 23.  In the areas of math and written language H.J. performed in the average range while her performance in reading was in the low average range.  *Id.*  H.J.'s Title One Reading Instructor wrote at the beginning of H.J.'s second grade:

> Their child (HJ – Deutz's room) qualified for Title service this year, just as she has qualified in the past. She is pretty far behind in her reading abilities. *Ex. D199.*

Ex. 102.  H.J.'s first grade teacher asked Marshall administration's about initiating a special education evaluation but she was told by Marshall administration not to initiate one on H.J.'s

behalf. *Complain*t at ¶ 36.

Marshall provided H.J. an individualized health plan ("IHP") on the 28th of March 2012 for her 2011/12 school year. Ex. 53. The IHP addressed H.J.'s need to use an inhaler at the school nurse's office and stomachaches that H.J. was experiencing. *Id.* The IHP is a regular education intervention that is not governed by any state or federal disability statute. Complaint at ¶ 37. Plaintiffs have no due process or legal mechanism by which to challenge or change an IHP. *Id.* Marshall Public Schools has no policy or procedure by which Plaintiffs can challenge or change the IHP. *Id.* Marshall has not contested this assertion.

The IHP written for H.J.'s 2012/13 school year identified the presenting problems as her asthma, bilateral weakness and generalized anxiety. *Id.* at ¶ 38. No Section 504 evaluation was initiated and no modifications and accommodations were provided. *Id.*

The IHP for H.J.'s 2nd grade (2013/14), identified the presenting problems as H.J.'s asthma, generalized anxiety disorder, constipation and clothing needs relating to her fluctuating body temperature in school. Ex. 55. While the IHP identifies H.J.'s constipation as a presenting medical need the IHP is silent regarding how the medical need will be accommodated. *Id.*

The Plaintiffs requested in writing on the 28th of January 2014 that Marshall evaluate H.J. for a Section 504 Plan because of her susceptibility to illnesses and the impact the illnesses have on her educational performance. Ex. 24. An evaluation plan was written on the 3rd of February 2014 reflecting that the evaluation concern was "long-term effects of chemotherapy resulting in susceptibility to other common illnesses." Ex. 34. The evaluation plan identified that H.J.'s illnesses "[are] directly impacting education performance." *Id.* The evaluation would include the school reviewing "medical/mental health provider records." *Id.*

Love, on the 3rd of February 2014, gave the Plaintiffs copies of Marshall's

correspondence and 504 questionnaires given to H.J.'s medical and mental health practitioners. Ex. 102. The practitioners were to complete the questionnaires and return them to Love at Marshall. *Id.* The Plaintiffs delivered Marshall's correspondence and questionnaires but were not involved in the process of which documents were sent or received. *Id.* According to Marshall's records, the local nurse practitioner and U of M Oncology completed the questionnaires and sent them back. *Id.* However, the questionnaires Marshall sent had neither date nor signature lines, thus the dates they were completed are unknown. *Complaint* at ¶ 41. Both practitioners identified medical conditions, including frequent infections that affected H.J.'s attendance at school. Ex. 102. Both practitioners requested accommodations to the attendance policy. *Id.*

Marshall did not ask the practitioners to identify a medical diagnosis for H.J. and none of Marshall's documents asked that a licensed physician sign to verify a medical diagnosis. Ex. 102. Marshall's teachers and administrators would testify that their denial of special education services and/or a Section 504 plan was because H.J. did not have a "current medical diagnosis from a licensed physician." *Complaint* at ¶ 42.

On the 4th of February 2014, Love wrote to the Plaintiffs regarding "the attendance that [H.J.] has developed since the beginning of the school year." Ex. 103. According to Love, H.J. had missed 39 of the 102 day school year at Park Side Elementary. *Id.* Love asserted that because of the attendance policy and state law, until Plaintiffs could demonstrate that H.J.'s absences were related to a medical condition, Plaintiffs would be required to provide medical documentation of each illness. *Id.* Without this additional documentation that is not set forth in Marshall's Student Attendance policy (ex 104) and without the documentation, H.J's absences would not be excused. Ex. 29.

As a result of the additional documentation requirements, Plaintiffs provided Marshall with each and every medical excuse from all of H.J.'s medical and mental health practitioners. Each time H.J. had a cough or spiked a fever, Plaintiffs took her any available medical professionals at the local emergency rooms, urgent care, her nurse practitioner, and the medical specialist coordinated by her Oncology physicians. *Complaint* at ¶ 44. A cough that H.J. began with, over the period of time that Love is threatening truancy, developed into bronchitis, pertussis and eventually required surgery to resolve. *Id.* At that time H.J. was being seen by the U of M Oncology for follow up care and to find answers regarding the chronic URIs. *Id.* U of M Oncology sent H.J. to see medical specialists in immunology, pulmonary, and infectious diseases in an attempt to address the URIs. *Id.*

During the special education administrative hearing, Marshall's teachers and administrators testified in the administrative hearing that the reason H.J. was not entitled to special education and related services or a Section 504 plan is because Marshall did not have a *medical diagnosis signed by a licensed physician*. *Complaint* at ¶ 45. Marshall never told H.J.'s medical practitioners or the Plaintiffs that a *medical diagnosis signed by a licensed physician* was a preliminary requirement for H.J. to be identified and accommodated. Ex. 102; *Complaint* at ¶ 45. When Marshall provided its determination regarding H.J.'s eligibility under Section 504, without meeting with the Plaintiffs or permitting them to participate in the decision.[2]

Marshall held a meeting on the 5th of February 2014 between the Plaintiffs, teachers and administration regarding the Plaintiffs' request for special education or accommodations under an IEP or a Section 504 Plan. Ex. 105. This meeting also included a discussion of the "documentation necessary for comprehensive evaluation." *Id.*

---

[2] According to the signature page on Ex. 106, the signature lines only reflected Marshall personnel. There is not a signature line on the document for the Plaintiffs and Plaintiffs were not present for the meeting. *Jerve Aff.*

On March 6, 2014, Love corresponded again with the Plaintiffs regarding the very absences for which the Plaintiffs were seeking Marshall's assistance through a Section 504 plan. Ex. 29. Love's concern was that H.J. had "missed 54 full or partial days out of 118 total days of school." *Id.* Love asserted that Marshall was challenging the "legitimacy and consistency of" the physicians' notes that Marshall required the Plaintiffs provide. *Id.* According to Love, because the Plaintiffs produced the medical documents she previously demanded, and those notes came from five different medical facilities and nine different medical providers, the medical documentation were not legitimate. Id. The physicians' notes Plaintiffs' provided were all visits to medical practitioners to address H.J.'s URIs. *Complaint* at ¶ 47. This included local emergency rooms and urgent care providers, her local nurse practitioner, visits to the U of M Oncology, and all the specialists U of M Oncology recommended. *Id.*

At the time Love wrote to the Plaintiffs on February 5, 2014, H.J.'s Section 504 eligibility determination was pending. *Complaint* at ¶ 48. After Plaintiffs provided Marshall with all of medical excuses from the various medical resources, Marshall questioned the validity of the medical excuses and documentation. *Id.* Rather than request additional information, consistent with Marshall's Section 504 Policy and Procedure or request a release of information from the Plaintiffs, Marshall insisted the Plaintiffs produce the medical practitioners Marshall identified for a face-to-face meeting outside of the presence of the Plaintiffs. *Id.* It is noteworthy that in identifying the specific medical practitioners Marshall wanted in attendance at the meeting, not one was a licensed medical professional. Instead, Love insisted that Klint Willert, Marshall's Superintendent, Darci Love, Cindy Pfieffer, school nurse, and Sabrina Ulrich, school social worker, meet alone with the identified medical and mental health practitioners. *Id.* The Plaintiffs declined the meeting because they were not invited to it and did

not want to be excluded from a meeting regarding their child. *Aff Jerve*; *Id.* Plaintiffs were also concerned that Marshall was requiring them to organize and schedule all of the medical professionals for an eligibility meeting that is not reflected in Marshall's Section 504 policy and procedure. *Aff. Jerve*; Ex. 104. Love closed the correspondence by noting that H.J.'s unexcused absences were "viewed as educational neglect and by law, will be reported to the department of Health and Human Services." *Id.*

Love again wrote to the Plaintiffs on March 6, 2014. Ex. 29. This correspondence was sent to Plaintiffs while H.J.'s eligibility for a Section 504 plan was pending. *Complaint* at ¶ 49. In the correspondence, Love raised concerns related to H.J.'s attendance. Ex. 29. Love identified that Plaintiffs were required to provide signed medical excuses from a physician for each day H.J. was absent. *Id.* Love detailed for Plaintiffs the three specific criteria that Love was insisting each physician provide with each excuse. *Id.* Love also challenged the U of M Oncology's medical excuse that it provided for H.J.'s absences. *Id.* Love falsely wrote that the Plaintiffs were denying Marshall H.J.'s medical and mental health records. *Complaint* at ¶ 49. The Plaintiffs provided Marshall with signed medical releases, as well as their consent to the Section 504 evaluation. *Id.* Love repeated her concern about the number of medical excuses Marshall was receiving, and drew the false and defamatory conclusion that Plaintiffs were "physician shopping". Ex. 29. Love also falsely accused the Plaintiffs of not having H.J. followed by one physician. *Id.* The U of M Oncology was the medical facility that followed, monitored and coordinated care and evaluations for all of H.J.'s illnesses. *Complain*t at ¶ 49. H.J.'s medical records reflect that the U of M Oncology had and continued to coordinate H.J.'s medical and mental health care from the date of her cancer diagnosis to the present. *Id.* Lee from U of M Oncology said as much in her multiple correspondences to Marshall. Love again

referenced the compulsory attendance laws, and educational neglect proceedings against the Plaintiffs. *Id*. Finally, Love also wrote that the child must have 7 or more unexcused absences to violate Marshall's attendance policy. *Id*. Later in testimony in the administrative hearing, Love conceded that at the time she wrote both correspondence, H.J. had not met the truancy criteria. Ex. 59, *Trans.302-303*; *Complaint* at ¶ 50.

On the 11th of March 2014, Love provided the Plaintiffs with Marshall's Section 504 Eligibility Determination. Ex. 106. The Eligibility Determination noted that H.J. experienced a "substantial number of absences with little evidence to substantiate need for absences (both short-term and extended absences)." *Id*. With respect to H.J.'s psychological needs related to her long-standing GAD, Marshall noted that there was "limited supporting detail and outdated reports." *Id*. Marshall concluded that H.J. was not eligible under Section 504 because the medical and mental health information is "limited and/or outdated." *Id*. The medical information Marshall received was the medical documentation Marshall requested. Ex. 107. The Section 504 Eligibility Determination Team was made up of teachers and administrators, including Love, and did not include the Plaintiffs. *Complaint* at ¶ 51.

After Marshall denied H.J.'s eligibility under the IDEA and Section 504 and continued to threaten truancy and educational neglect proceedings, the Plaintiffs requested a special education administrative hearing under the IDEA. *Complaint* at ¶ 52.

The parties participated in a special education administrative hearing on May 20th -22nd 2014. The ALJ issued a final order on the 10th of June 2014 finding that Marshall had not properly evaluated H.J.'s medical needs. *Id*. Marshall was ordered to conduct a comprehensive independent medical evaluation and to hire an education expert in the area of other health disabled (OHD). *Id*. The purpose of the evaluation and experts was to reconsider H.J.'s

eligibility under the IDEA.  The U of M Oncology recommended that Dr Joanna Perkins at Children's Hospitals and Clinics conduct the independent evaluation.  Marshall refused and retained its own experts without input from the Plaintiffs.  Complaint at 53.  Marshall's retained expert, Dr Mustafa Barbour did not address H.J.'s chronic medical conditions as they impacted her performance or attendance in school. Ex. 70.

As a result of the limited Barbour evaluation, Plaintiffs set up an evaluation with Dr Perkins at Children's Hospital and Clinics.  *Complaint* at ¶ 54.  Dr Perkins completed a comprehensive medical evaluation, including a referral to an immunologist for immunology abnormalities.  Ex. 108. The immunologist subsequently concluded that H.J.'s URIs are related to immunological abnormalities. *Complaint* at ¶ 54.

H.J. is a person with a disability defined by the ADA, Section 504 and MHRA. *Complaint* at ¶ 55. H.J. has both the physical and mental impairments of generalized anxiety disorder, bilateral lower extremity peripheral neuropathy, constipation, gastro-esophageal reflux, insomnia, and URIs. *Id*.; Ex. 108. H.J.'s physical and mental impairments substantially limit the major life activity of learning, including her URI related absences from her public school instruction. *Id*.

Marshall offered a Section 504 plan after the meeting between the parties on September 17, 2015.  The parties were unable to agree to the proposed Section plan for a number of reasons that have been articulated to Marshall on many occasions, including that while Marshall acknowledged that H.J. had chronic medical conditions that included "Generalized Anxiety Disorder (GAD), Asthma, Recurrent Sinus Infections, and Lower Extremity Weakness", Marshall's 504 plan still did not list chronic medical conditions identified by Dr Perkins and continued to ignore any accommodations for absences H.J. may experience as a result of those

chronic health conditions.  Mr Williams in his December 3, 2015 correspondence once again raised the spectre of truancy when he wrote "[w]e remain concerned about the number of days [H.J.] has been absent from school, though they are all excused absences."  Ex. 65.

Plaintiffs have alleged that by refusing to identify, evaluate and reasonably accommodate H.J., Marshall caused H.J. to suffer harm and damages.  *Complaint* at ¶ 56.  Those damages include her state mandated right to an education, loss of educational opportunities, emotional and psychological harm, and the exacerbation of her existing mental health condition. *Id.*

As of the day this memorandum is submitted to the Court, H.J. is still without a Section 504 plan that has recognized her medically identified physical and mental impairments.  *Jerve Aff.*

## SUMMARY JUDGMENT STANDARD

Summary judgment under Rule 56 is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant, is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202. (1986). A dispute over a fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict for either party. *Ohio Cas. Ins. Co. v. Union Pac. R.R.,* 469 F.3d 1158, 1162 (8th Cir.2006). In determining a motion for summary judgment, the court "must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the non-moving party." *Winthrop Res. Corp. v. Eaton Hydraulics, Inc.,* 361 F.3d 465, 468 (8th Cir.2004).

Throughout its facts and arguments, Defendant argued that H.J. did not suffer

*educational harm* and therefore has no claim for damages. *Marshall's Brief* at 28. Defendant

urges the Court to adopt a standard that does not exist in statute or case law.[3] In doing so,

Defendant provides no authority for the adoption of this unique standard. *Id*. Defendant also

devotes many of its uncontested facts to contesting the harm that may have accrued. *Id*. These

facts related to the injuries that H.J. and her parents suffered (i.e., out-of-pocket expenses) is

central to the issues before the Court.

    Defendant also alleges significant facts that are material to Plaintiff's claims and require

resolution by the trier of fact in this case.

## ARGUMENT

    Plaintiffs' raised three essential claims in their Complaint. First, that Marshall failed to

evaluate and reasonably accommodate H.J. under Section 504 of the Rehabilitation Act and its

implementing regulations. This claim remains a live controversy despite all the litigation

between the parties and Marshall's assertion of uncontested facts. H.J. is still without a Section

504 plan that recognizes her identified chronic health conditions. Second, Marshall engaged in

disability discrimination when it refused to identify, evaluate and accommodate H.J. consistent

with its own policy. In the conduct of its Section 504 evaluation, not only did Marshall continue

to refuse to recognize her chronic health conditions but also since 2012 to the present placed

excessive demands on the Plaintiffs in order for H.J. to be evaluated and identified. The

demands were not part of any of Marshall's policies regarding student illnesses, absences, and

Section 504 policy. Finally, Plaintiffs have alleged that Marshall's employees retaliated against

Plaintiffs as they attempted to preserve and protect H.J.'s rights by threatening truancy and

---

[3]  Defendant has raised this argument in its Motion for Summary Judgment in14-cv-2114. The argument was
rejected. The Minnesota statute governing special education administrative hearings permits administrative law
judges to grant compensatory damages where the child has been "denied educational benefit." Minn. Stat.
125A.091, subd. 21.

educational neglect against Plaintiffs for the absences for which Plaintiffs were actively seeking assistance from Marshall. In addition to the excessive demands, the threats of truancy and educational neglect, Marshall also made demonstrably false and baseless allegations against the Plaintiffs for physician-shopping. As the Plaintiffs have asserted, the allegations of physician shopping came after Marshall insisted that the Plaintiff provide medical notes for each and every absence H.J. experienced.

The identified purpose of the ADA was to "provide clear, strong, consistent, enforceable standards" to remedy discrimination in employment (Title I), in the services of public entities (Title II), and in places of public accommodation (Title III). *Id.* § 12101(b)(2). The ADA has defined discrimination as a failure to "make reasonable modifications in policies, practices, or procedures" that are "necessary to afford ... privileges, advantages, or accommodations to individuals with disabilities" or a failure to "take such steps as may be necessary to ensure that no individual with a disability is ... treated differently than other individuals because of the absence of auxiliary aids and services." *Id.* § 12182(b)(2)(A)(ii), (iii). The ADA also prohibits places of public accommodation such as Creighton from discriminating against individuals with disabilities "in the full and equal enjoyment" of the "privileges, advantages, or accommodations" they offer. 42 U.S.C. § 12182(a).

Similar to the ADA, Congress enacted the Rehabilitation Act as a "comprehensive federal program," *Consol. Rail Corp. v. Darrone,* 465 U.S. 624, 626, 104 S.Ct. 1248, 79 L.Ed.2d 568 (1984), to ensure that qualified individuals with disabilities would not "be denied the benefits of [ ] or be subjected to discrimination under any program or activity" receiving federal funding, 29 U.S.C. § 794(a). Under Section 504, recipients of federal funds are required to "provide a free appropriate public education to each qualified handicapped person who is in the

recipient's jurisdiction, regardless of the nature or severity of the person's handicap." 34 C.F.R. Section 104.33(a). The term "appropriate education" is defined as "the provision of regular or special education and related aids and services that (i) are designed to meet individual educational needs of the handicapped persons as adequately as the needs of non-handicapped persons are met, and (ii) are based on adherence to the procedures that satisfy the requirements of Section 104.34, 104.35, and 104.36." 34 C.F.R. Section 104.33(b).

Section 504 has a reasonable accommodations mandate:

A recipient shall make reasonable accommodation to the known physical or mental limitations of an otherwise qualified handicapped applicant or employee unless the recipient can demonstrate that the accommodation would impose an undue hardship on the operation of its program.

28 C.F.R. § 41.53; 28 C.F.R. 35.130(b)(7).

The Eighth Circuit has previously found that the ADA and Section 504 "similar in substance," case law interprets them as "interchangeable." *Gorman v. Bartch,* 152 F.3d 907, 912 (8th Cir.1998).

The Supreme Court in *U.S. Airways v. Barnett*, 535 U.S. 391, 152 U.S. 391, 152 L.Ed.2d 589 (S.Ct. 2002) affirmed the right of individuals to bring reasonable accommodations claims within the employment context.  The same analysis for failure to evaluate and accommodate claims in the education setting is applicable in the instant case.

I.    DEFENDANT IS COLLATERALLY ESTOPPED FROM RE-LITIGATING FACTS ADJUDICATED IN THE RELATED CASE.

Defendant in its brief, while asserting that Plaintiffs failed to bring compulsory counterclaim, devoted a significant amount of time to facts that are either under contest or have already been resolved by the Court in *Marshall Public Schools v. H.J*., et al., No. 14-cv-2114-JRT, slip op. (D. Minn. August 11, 2015)("Order"). Marshall re-litigating facts that have already

been adjudicated should be collateral estopped from trying the same facts in this related case.

Collateral estoppel applies in a case where:

> (1) the issue sought to be precluded is identical to the issue previously decided; (2) the prior action resulted in a final adjudication on the merits; (3) the party sought to be estopped was either a party or in privity with a party to the prior action; and (4) the party sought to be estopped was given a full and fair opportunity to be heard on the issue in the prior action.

*Canady v. Allstate Ins. Co.,* 282 F.3d 1005, 1018 (8th Cir.2002) (internal quotation marks omitted), *abrogation on other grounds recognized by Ark. Blue Cross & Blue Shield v. Little Rock Cardiology Clinic, P.A.,* 551 F.3d 812, 821-22 (8th Cir.2009).  While the doctrine of collateral estoppel is not rigidly applied in our circuit, courts are urged to "focus is on whether the application of collateral estoppel will work an injustice on the party against whom estoppel" is sought. *Oldham v. Pritchett,* 599 F.2d 274, 279 (8th Cir.1979).

In this case, Defendant asserts facts contrary to the conclusions reached by the Court in its final order in the related case.  The Court noted that despite remaining in remission, H.J. continued to have frequent illnesses and infections including "fevers, coughs, and colds, to constipation, bilateral lower extremity weakness, recurrent urinary tract infections, gatroesophageal reflux, insomnia and anxiety."  *Order* at 3.

The Court found that Defendant "received the report diagnosing H.J. with [Generalized Anxiety Disorder] and that the report hypothesized that the condition might be interfering with her ability to attend and focus on school."  *Order* at 17.  The Court concluded that "armed with this information and the parents' request for a special education evaluation, [Marshall] had reason to suspect that a medical evaluation might provide critical information for the purposes of a special education determination." *Id.*  In so finding, the Court concluded that Marshall had not met its affirmative obligation to evaluate H.J. under the Individuals with Disabilities Education

Act. Nevertheless, Defendant re-argued the same facts. Defendant also re-argued the facts related to the scope and propriety of its special education evaluation. *Marshall's Brief* at 4-5. The Court also found that H.J. lagged behind her peers in her reading skills as a result of the absences. The Court adopted the administrative law judge's findings that Marshall had not properly evaluated H.J.

Defendant's facts section pick up, largely after the administrative hearing decision had been rendered and was under appeal. Defendant argued, as it had in Civil File No. 14-cv-2114, that the Parents "did not identify any single chronic or acute illness underlying the reasons" for the absences. *Marshall's Brief* at 3. Accordingly, Marshall re-argues that it was not notified of its affirmative action under Section 504. *Id.* However, the Court already concluded that the University of Minnesota, *Pediatric Neuro-psychological Evaluation* ("Neuropsych. Eval.") dated March 30, 2012 was notice to Marshall of H.J.'s need for a comprehensive evaluation. Defendant are collaterally estopped from re-litigating this finding. The Neuropsych Eval recommended the following:

> **Health/Physical Status**: [H.J.] has a significant health history; 1-1-02 @ 18 months old was diagnosed with anaplastic large cell lymphoma. She is currently in remission, and sees the Dr every 3-6 months for follow-ups. 9-11 was diagnosed with bronchitis, and treated 9-11 Asthma diagnosis-inhaler prn, and 20 mins B/4 PE class, 10-16-11 Lactose intolerant, switched to soy milk per Dr, parent. 12-15-12 strep throat diagnosis, 2-20-12 Generalized Anxiety Disorder diagnosis, 2-21-13 chronic constipation – Miralax given seeing GI Dr per parent. 2-28-12 Influenza diag. and treatment. 4-19-12 Bronchitis diag. and treatment. 4-19-12 Bronchitis diag. and treatment, 5-22-13 Adnoidectomy and sinus scrapping, 9-6-13 broken Left toe, no PE until 12-18-13 – use of knee walker recommended, along with PT. She is current with all her immunizations, she does have very frequent visits to the school nurse for misc. needs; Stomaches, headaches, sore chest, musculoskeletal etc.

Ex. 1.

As the record before this Court supports, from the date of the Neuropsych Evaluation to the present Marshall was notified of H.J.'s chronic health conditions including GAD. The record

also reflects that an evaluation of H.J.'s chronic health conditions was never undertaken by Marshall in the special education or Section 504 context. H.J. remains unaccommodated today.

## II. PLAINTIFFS FAILURE TO ACCOMMODATE AND DISABILITY DISCRIMINATION AND RETALIATIONS CLAIMS ARE NOT COMPULSORY COUNTERCLAIMS CONSISTENT WITH FED.R.CIV.P. 13.

Marshall argued that Plaintiffs claims under the ADA, Section 504 and MHRA should be dismissed because they claims are compulsory counterclaims under Fed.R.Civ.P. Rule 13(a). Marshall's Brief at. In support of its argument, Marshall cites decisions from foreign jurisdiction without identifying or analyzing the standard for compulsory counterclaims governing this circuit. According to the Eighth Circuit's in *Feed Management Systems v. Brill*, 518 F.Supp.3d 1094 (D.Minn. 2007):

> A compulsory counterclaim is one that arises out of the same transaction or occurrence that is the ***subject matter of the opposing party's claim***. Fed.R.Civ.P. 13(a). The Eighth Circuit articulated four tests for determining whether a counterclaim arises out of the same transaction or occurrence. *Minnetonka, Inc. v. SaniFresh Inn, Inc.,* 103 F.R.D. 377, 379 (D.Minn.1984). First, are "the issues of fact and law raised by the claim and counterclaim largely the same?" *Id.* Second, "[w]ould res judicata bar a subsequent suit on defendant's claim absent the compulsory counterclaim rule?" *Id.* Third, "[w]ill substantially the same evidence support or refute plaintiffs claim as well as defendant's counterclaim?" *Id.* And fourth, "Is there any logical relation between the claim and the counterclaim?" *Id.* A positive response to any of these questions "means that the counterclaim is compulsory." *Id.*

*Feed Management* at 1096 (emphasis added). Defendant's assertion of compulsory counterclaims must fail as a matter of law because the subject matter of the administrative special education hearing did not include any non-IDEA claims. The claims under the ADA, Section 504 and MHRA were dismissed without prejudice based on a lack of subject matter jurisdiction prior to the administrative hearing. In the ALJ's Third Pre-hearing Order, Plaintiffs were precluded from raising any facts or claims under the ADA, Section 504 or the MHRA. In addition, the administrative hearing transcripts reflect Marshall's objections to the introduction

of any evidence related to those claims. Ex. 59, *Trans. 65-66, 139 and 141.*

An examination of the standard in *Feed Management* supports that the IDEA special education administrative hearing did not permit facts or law related to the ADA, Section 504 or the MHRA to be the subject matter of the administrative hearing. While specific findings of fact may estop a party from re-adjudicating those facts, Plaintiffs have not had the opportunity to present the facts and law supporting their ADA, Section 504 and MHRA claims. Res judicata does not bar claims that have been dismissed without prejudice and are not the subject matter of an administrative hearing. While some limited facts from the administrative hearing may support Plaintiffs' claims in this present matter, the evidence presented in the administrative hearing was limited to the IDEA. As the facts asserted in the Complaint clearly reflect, the facts and law governing the disability discrimination and retaliation claims are quite different than the facts and law permitted to be introduced into an administrative hearing. Finally, there is no logical relationship between Marshall's appeal of an IDEA administrative hearing and the presentation and adjudication of facts and claims under the ADA, Section 504 and MHRA. Defendant has offered no authority for the assertion that Plaintiffs claims in this matter should be collaterally estopped. Indeed, the case law in this circuit has affirmed the limited subject matter jurisdiction in IDEA administrative hearings and claims under the ADA, Section 504 and MHRA

Defendant's argument regarding compulsory counterclaims is without merit as it did not examine the Eighth Circuit's standards in *Feed Management*. An examination of the standard in conjunction with the Plaintiffs claims and the prior rulings in the administrative hearing do not support Defendant's argument.

## III. THE *MONAHAN* BAD FAITH AND GROSS MISJUDGMENT STANDARD WAS OVERTURNED IN ALEXANDER V. CHOATE AND HAS BEEN LIMITED TO SUBSTANTIVE CHALLENGES TO THE STUDENT'S EDUCATION BY THIS COURT.

Defendant devoted much of its argument asserting that the "bad faith and gross misjudgment" standard is applicable to all claims under Section 504 and the ADA, including the Plaintiffs' claims of failure to accommodate and disability discrimination and retaliation. Defendant's reliance on the *Monahan* standard is misplaced. The 1982 *Monahan* bad faith and gross misjudgment standard was overturned three years later by the United States Supreme Court in *Alexander v. Chaote,* 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985).

The Court in *Alexander* identified the following issue for consideration of disability discrimination claims:

> The first question the parties urge on the Court is whether proof of discriminatory animus is always required to establish a violation of § 504 and its implementing regulations, or whether federal law also reaches action by a recipient of federal funding that discriminates against the handicapped by effect rather than by design. The State of Tennessee argues that § 504 reaches only purposeful discrimination against the handicapped. As support for this position, the State relies heavily on our recent decision in *Guardians Assn. v. Civil Service Comm'n of New York City,* 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983).

*Alexander* at 292.

The Court, in examining this question, referred to its previous decision in *Guardians Assn. v. Civil Service Comm'n of New York City,* 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983)(holding that discrimination claims under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* required a showing of intentional discrimination.) The Court rejected the petitioners' argument that Section 504 claims were limited to intentional discrimination finding that:

> *Guardians,* therefore, does not support petitioners' blanket proposition that federal law proscribes only intentional discrimination against the handicapped. Indeed, to the extent our holding in *Guardians* is relevant to the interpretation of § 504, *Guardians* suggests that

the regulations implementing § 504, upon which respondents in part rely, could make actionable the disparate impact challenged in this case.[10] Moreover, there are reasons to pause before too quickly extending even the first prong of *Guardians* to § 504. Cf. *Consolidated Rail Corp. v. Darrone,* 465 U.S. 624, 632-633, n. 13, 104 S.Ct. 1248, 1253-1254, n. 13, 79 L.Ed.2d 568 (1984) (recognizing distinctions between Title VI and § 504)

Discrimination against the handicapped was perceived by Congress to be most often the product, not of invidious animus, but rather of thoughtlessness and indifference—of benign neglect. Thus, Representative Vanik, introducing the predecessor to § 504 in the House, described the treatment of the handicapped as one of the country's "shameful oversights," which caused the handicapped to live among society "shunted aside, hidden, and ignored." 117 Cong.Rec. 45974 (1971). Similarly, Senator Humphrey, who introduced a companion measure in the Senate, asserted that "we can no longer tolerate the invisibility of the handicapped in America . . . ." 118 Cong.Rec. 525-526 (1972). And Senator Cranston, the Acting Chairman of the Subcommittee that drafted § 504,[14] described the Act as a response to "previous societal neglect." 119 Cong.Rec. 5880, 5883 (1973). See also 118 Cong.Rec. 526

*Alexander* at 295-296. The conclusion by the United States Supreme Court that intentional discrimination, or bad faith or gross misjudgment, is not the correct standard by which disability discrimination claims are to be adjudicated.

In *A.P., ex rel. Peterson v. Anoka-Hennepin Sch. No. 11*, 538 F.Supp.2d 1125 (D. Minn. 2008) the court found that the bad faith and gross misjudgment standard was limited to "substantive challenges" to the student's education plan. In reaching this conclusion, the court examined the United States Supreme Court's decision in *Alexander v. Chaote* and its impact on the *Monahan* standard and its jurisprudence.

Finally, Defendant argued that because Plaintiffs did not use the specific phrase "bad faith and gross misjudgment" all claims should be dismissed. Defendants assert, without merit, that the averment that Defendant's actions were "intentional, grossly, recklessly and deliberately indifferent to [H.J.'s] rights" are insufficient to rise to the bad faith and gross misjudgment standard Defendant urged on this Court.

## A. Plaintiffs Pled Facts that Meet the Bad Faith and Gross Misjudgment Standard.

Setting aside Plaintiffs' argument that bad faith and gross misjudgment has been overturned by the United States Supreme Court in *Alexander v. Choate*, the facts pled in the complaint support the claims against Marshall for bad faith and gross misjudgment.

In this case, despite receiving years of medical information and requests for a Section 504 plan for H.J. through the medical professionals and parents, Marshall refused to act. Rather than identify, evaluate and accommodate H.J., Love sent the Plaintiffs two correspondence threatening truancy and educational neglect proceedings, as well as falsely alleging that Plaintiffs were physician-shopping. Love also falsely asserted that Plaintiffs had either refused to sign releases of information or revoked releases between Marshall and the medical and mental health professionals. The false allegations are now a part of H.J.'s permanent education record. In addition to violating H.J.'s rights under the acts by refusing to conduct an evaluation that included consideration of H.J's chronic health and mental health conditions and providing reasonable accommodations to the attendance policy, Marshall has, against all evidence to the contrary, and contrary even to the ALJ's and Court's factual determinations, continued to allege that Plaintiffs have failed to produce sufficient medical information regarding her impairments. Finally, Marshall throughout its interaction with interactions has deliberately put barriers in front of the Plaintiffs. Defendant's required and insisted that Plaintiffs provide medical information and documentation for H.J. to be evaluated and accommodated that are well beyond the medical information and documentation required under Marshall's Student Attendance policy, Illness policy (Ex. 109) and Section 504 Policy.

**IV.** **PLAINTIFFS PROPERLY PLED FAILURE TO EVALUATE AND ACCOMMODATE, DISABILITY DISCRIMINATION AND RETALIATION CLAIMS UNDER THE ACTS.**

Plaintiffs have properly pled failure to evaluate and accommodate claims. As the matter stands today, a Section 504 plan identifying and evaluating H.J.'s chronic health conditions, as well as accommodating those conditions has yet to be written and agreed upon by the parties, despite Defendant's factual assertions to the contrary.

In March 2012, Marshall was put on notice that H.J. was a student with identified disabling conditions. The direct recommendations in the Neuropsych Eval were ignored. As were Lee's multiple correspondence to Marshall in support of a Section 504 plan.

After Marshall refused to identify H.J. under the IDEA, Plaintiffs requested a Section 504 evaluation and plan on January 28, 2014. *Ex. 24*:

> [H.J.] has completed multiple rounds of chemotherapy that cause several long-term effects, resulting in her being more susceptible to other common illnesses. These illnesses directly impact her educational performance and needs. Though the school and teachers have attempted to address some areas of concern, [H.J.] continues to have difficulties, as many of the interventions have been unsuccessful.

*Ex. 20 and 24*. On February 3, 2014, H.J.'s Parents received and signed the Permission to Evaluate and the Evaluation Plan. Ex. 25, second page. On February 4, 2014, the day after the Plaintiffs were provided to the Section 504 materials, Love sent out her first correspondence referencing truancy against H.J. for her absences. The following day Marshall and the Plaintiffs met to discuss the items set forth on Marshall's agenda for the meeting. Ex. 105. The agenda in exhibit no. 27 and exhibit no. 28 was not provided to the Plaintiffs until the complete education record was disclosed through the administrative hearing. *Jerve Aff*. Once again, Marshall chose to ignore this information.

This Court in *A.P., ex rel. Peterson v. Anoka-Hennepin Sch. No. 11*, 538 F.Supp.2d 1125 (D. Minn. 2008) examined a reasonable accommodation claim. In *A.P.*, a public school student

brought claims under the ADA, Section 504 and the MHRA.  The student asserted that Anoka –

Hennepin Public Schools ("Anoka-Hennepin") failed to accommodate his diabetes when it

refused to operate the student's insulin pump and glucose meter and declined to be trained for a

hypoglycemic emergency.  *Id.* at 1132.   The court in A.P. found:

> Several aspects of the ADA and its implementing regulations make it clear that covered
> entities have a duty to grant reasonable accommodations to disabled persons. As noted
> above, the "Findings" section of the ADA explicitly identifies the "failure to make
> modifications to existing facilities and practices" as one of the "various forms of
> discrimination" at which the law is directed. 42 U.S.C. § 12101(a)(5). Further, embedded
> in Title II's definition of a "qualified individual with a disability" is language reflecting
> the duty to make reasonable accommodations. *See* 42 U.S.C. § 12131(2) (defining
> "qualified individual with a disability" as someone who meets eligibility requirements
> "with or without reasonable modifications to rules, policies, or practices"). Finally, the
> reasonable-modifications regulation — which, of course, has the force of law — requires
> covered entities to provide reasonable accommodations unless doing so would
> "fundamentally alter" the affected program. 28 C.F.R. § 35.130(b)(7).

*A.P.*, at 1140.

As the court noted in *A.P.*, the Supreme Court case law supports reading federal laws against

disability discrimination broadly enough to reach failure-to-accommodate claims. *Id*. In examining

the legislative history of the Rehabilitation Act, the Court concluded that: "Discrimination against

the handicapped was perceived by Congress to be most often the product, not of invidious animus,

but rather of thoughtlessness and indifference — of benign neglect." *Alexander v. Choate,* 469

U.S. 287, 295, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985).  The Supreme Court in *Olmstead v. L.C.,*

upheld a finding of discrimination under the ADA against mental patients who were

institutionalized rather than given the community placements recommended by their doctors, the

Court characterized the challenged conduct this way:

> Dissimilar treatment correspondingly exists in this key respect: In order to receive needed
> medical services, persons with mental disabilities must, because of those disabilities,
> relinquish participation in community life they could enjoy given *reasonable
> accommodations,* while persons without mental disabilities can receive the medical services
> they need without similar sacrifice.

527 U.S. 581, 601, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999) (emphasis added). The *Olmstead* rejected the state assertion that disability discrimination could not be asserted "`by reason of' their disability because they were not denied community placement on account of those disabilities." *Id.* at 598, 119 S.Ct. 2176. The Court responded: "We are satisfied that Congress had a more comprehensive view of the concept of discrimination advanced in the ADA." *Id.*

As the court in *A.P.* found:

> *Alexander* and *Olmstead* therefore support this Court's conclusion that the ADA and the Rehabilitation Act prohibit, as a type of disability discrimination, the failure to provide reasonable accommodations to a disabled person. Decisions from federal appeals courts other than the Eighth Circuit also support this conclusion. For instance, the Seventh Circuit held, after carefully analyzing the question, that "it is possible to demonstrate discrimination on the basis of disability by a defendant's refusal to make a reasonable accommodation." *Washington v. Ind. High Sch. Athletic Ass'n, Inc.,* 181 F.3d840, 848 (7th Cir.1999); *see also McPherson v. Mich. High Sch. Athletic Ass'n, Inc.,* 119 F.3d 453, 460 (6th Cir.1997) (holding that one way for the plaintiff to establish discrimination under Title II of the ADA and the Rehabilitation Act would be to show that the defendant "could have reasonably accommodated his disability, but refused to do so"); *Crowder v. Kitagawa,* 81 F.3d 1480, 1483 (9th Cir.1996) ("Congress intended the ADA to cover at least some so called disparate impact cases of discrimination....").

*A.P.* at 1141.

Marshall argued, in the alternative, that it has "reasonably accommodated" H.J. *Marshall Brief* at 28. In support of that argument, Marshall asserts that the only accommodation denied H.J. was "the opportunity to keep the Student out of school without a medical excuse." *Id.* at 29. Marshall also asserted that "at no time . . . did Plaintiffs ever identify a disabling condition that required the Student to miss school." Similar to its arguments in 14-cv-2114, Marshall conflates the individualized healthcare plan (IHP) with a Section 504 accommodation plan. *Id.* An IHP is not identified in state rule or statute as an enforceable right for a child with a disability.

As asserted by the Plaintiffs Marshall has yet to acknowledge in any Section 504 plan H.J's chronic medical conditions and its impact on H.J. performance and participate in school.

The Eight Circuit Court of Appeals examined failure to accommodate claims under Section 504 of the Rehabilitation Act in *Argenyi v. Creighton Univ*., 703 F.3d 441 (8th Cir. 2013). In *Argenyi*, a hearing impaired medical student requested specific accommodations (Communication Access Realtime Transcription ("CART") for his impairment from Creighton University. Creighton denied Argenyi's request for accommodations prior to his attendance citing the requests for accommodations were inadequate because the physician's differed in their recommendations and no physician has made a "direct request" for the accommodations. *Id.* at 444. Upon attending, Creighton offered an FM system rather than the CART. After Argenyi tried the FM system, he renewed his request for CART because he was unable to meaningfully participate nor be an independent medical student. Similar to the matter before the Court, physicians had repeatedly endorsed accommodations for Argenyi's hearing impairment. Nevertheless, Creighton declined to provide the requested accommodation and began cautioning Argenyi about asking for additional accommodations.

The Court in *Argenyi* set forth the following prima facie claims under the ADA and Rehabilitation Act:

> To assert his discrimination claim under either statute, [complainant] must show that (1) [s]he is disabled and academically qualified to attend [the school], (2) [the school] is a "place of public accommodation (for ADA purposes) and receives federal funding (for Rehabilitation Act purposes)," and (3) [the school] discriminated against him based on his disability. *Mershon v. St. Louis Univ.,* 442 F.3d 1069, 1076–77 (8th Cir.2006).

*Id.* at 447.

Plaintiffs have alleged in this case that H.J. is disabled, that Marshall is a public education program within the acts and that H.J. has been denied identification, evaluation and reasonable accommodations from Marshall. Defendant has alleged that H.J. is not disabled, or that it is not a public entity subject to the acts. Instead, Defendants have erroneous relied on the

*Monahan* bad faith and gross misjudgment as the basis for dismissing Plaintiffs claims.

*Marshall's Brief* at 16 -27.

Marshall argued that even if Plaintiffs' failure to accommodate claims survive summary judgment, Marshall has reasonably accommodated H.J. *Marshall's Brief* at 28. Returning to its instance that the Plaintiffs have not provided adequate medical information, Marshall alleged that it "accommodated every medical condition the Parents identified." *Id*. Whether Marshall accommodated H.J. for her identified medical conditions is the central factual contest between the parties. Plaintiffs have specifically alleged and supported the following:

> Since the fall of 2012, Plaintiffs and [H.J.'s] medical professionals have asked Marshall, in writing, to identify, evaluate and accommodate [H.J.] and her disabling conditions, including her absences related to her URIs. From 2012 until the present Marshall has refused to identify, evaluate or accommodate [H.J.] in each area of impairment.

*Complaint* at p. 2, ¶ 3. Marshall has refused to recognize those impairments, as Plaintiffs assert and support with the medical professionals, that H.J. has not yet been identified, evaluated or accommodated consistent with Section 504. Specifically, Plaintiffs asserted:

> Once the ALJ ordered medical assessment was completed, Marshall again denied H.J. eligibility under the IDEA and instead offered a Section 504 plan that continued to refuse to recognize the absences related to H.J.'s URIs.

*Complaint* at ¶ 6.

The failure to evaluate and accommodate central to the disability discrimination claims and Marshall's intentional conduct in obstructing H.J.'s identification and evaluation as set forth herein support those claims. The factual allegations regarding the evaluation, accommodation and disability discrimination claims have more than met the pleading requires articulated by the Eighth Circuit in *Argenyi*.

## B.     PLAINTIFFS HAVE PROPERLY PLED RETALIATION CLAIMS

The Eighth Circuit Court of Appeals has identified the prima facie case of retaliation in the employment context, "a plaintiff must show that (1) she engaged in a statutorily protected activity, (2) the employer took an adverse action against her, and (3) there was a causal connection between the adverse action and the protected activity." *Hill v. Walker,* 737 F.3d 1209, 1218 (8th Cir. 2013) (applying *McDonnell Douglas* framework to ADA retaliation claim); *accord McBurney v. Stew Hansen's Dodge City, Inc.,* 398 F.3d 998, 1002 (8th Cir. 2005) (applying *McDonnell Douglas* framework to FMLA retaliation claim); *Kaufenberg v. Schwan's Home Serv., Inc.,* No. A08-0214, 2009 WL 234014, at *2 (Minn. Ct. App. Feb. 3, 2009) (applying *McDonnell Douglas* framework to WCA retaliation claim.

Accordingly, if Plaintiffs establishes a prima facie case, then the burden shifts to Marshall to proffer a non-retaliatory reason for the adverse action. *See Muor v. U.S. Bank Nat'l Ass'n,* 716 F.3d 1072, 1076 (8th Cir. 2013). The burden then shifts back to Plaintiffs to produce evidence sufficient to show that Marshall's proffered reason for the adverse action is pretext for retaliation. *Id.*

Defendant argued that Plaintiffs' retaliation claims were without merit because Marshall was simply complying with the Minnesota Compulsory Attendance Instruction Act. *Marshall's Brief* at 32. Plaintiffs respond that Love's explanations for the threats are a pretext because at the time the correspondence were sent to Plaintiffs, H.J. had not yet been absent without a valid excuse for in excess of seven days. Love's testimony on the administrative record reflected that she did not follow Marshall's Student Attendance policy or Marshall's internal procedure. *Trans. 302-303.* She testified that she sent the original educational neglect correspondence in February 2014, long before H.J. had accumulated any unexcused absence. The second letter

threatening educational neglect and truancy was sent one day before H.J. had obtained what Marshall characterized as absent without a valid excuse. During the special education administrative hearing, Love, testified that the Marshall Student Attendance policy required that H.J. be absent without a valid excuse for seven or more days. Ex. 59, *Trans. 302-303.* At the time of both of Love's correspondence, H.J. had not yet been absent without a valid excuse for seven days. *Trans. 302-303.* The Minnesota Compulsory Attendance Instruction Act is clear that a child may be absent with a "valid excuse." Minn.Stat. 260A.02, subd. 2. As demonstrated time and time again, H.J. was never absent without a valid excuse. Marshall's policy defined *excused absences* as including illness, serious illness in the student's immediate family, a death or funeral in the immediate family, and medical and dental appointments. Ex. 104. Marshall expanded the requirements significantly for Plaintiffs to be granted a valid excuse. On many occasions Love challenged the validity of medical excuses and orders without any medical training or knowledge. She would simply repeated that it was "insufficient" documentation though the documentation more than comported with the Attendance policy and state law. Unexcused absences are, according the Marshall's policies "absences without a valid excuse." *Id.* at p. 511. In this case, Marshall was directly challenging the medical excuses and denying their validity.

Love testified that she did refer H.J.'s absences to human services (Ex. 59, *trans. 308*), as was typical under Marshall procedure, but instead sent the first truancy letter to Plaintiffs long before H.J. had seven unexcused absences. *Id.* at 308.

The causal connection between Plaintiffs advocacy and Love's retaliation are evident in the timing of Love's correspondence. The first letter threatening truancy and educational neglect on February 4, 2014. This was the day after the Parents met with Love for a Section 504

evaluation plan. According to the notes taken on February 3, 2014, Marshall noted that the

Section 504 evaluation concern were as follows:

> Long-term effects of chemotherapy resulting in susceptibility to other common illnesses. These illnesses directly impact education performance.

Ex. 25, p.2. Darci Love was in attendance at the February 3 meeting. According to Marshall's

Section 504 Evaluation Plan, Marshall was to review and analyze the following:

1. Attendance history;
2. Achievement data;
3. Medical/mental health provider reports;
4. Teacher/school staff recommendation/observations.

*Id*. It was evident at that point that the Plaintiffs were seeking accommodations for H.J.'s illness

related absences. The day following the Section 504 evaluation meeting Love sent

correspondence asserting the following:

> For these reasons, we need your student attending school on a daily basis. If attendance is not possible due to a medical condition, please know from this point forward we are requiring a signed doctors (sic) note stating that [H.J.] cannot attend school, the duration of the absence, and the reason for the absence. . . . Please know that continued absences will all under Minnesota State Statutes and School Board Policy regarding truancy.

Ex. 102. The Plaintiffs were concerned with the allegation of truancy and tried to work with

Marshall to get H.J. evaluated under Section 504. Love wrote to the Plaintiffs again raising the

issue of truancy and educational neglect on February 27, 2014. Ex. 46.

Love also testified that she sent the second letter on March 6 the day before H.J. was

absent the requisite seven days. Ex. 59,*Trans. at 305-306*. At the same time that Love was

prematurely sending truancy notices to H.J. and her parents, Plaintiffs were actively seeking

accommodations for H.J. under the IDEA and Section 504. Once again, the temporal connection

between the threats and advocacy are evident. The second correspondence threatening

educational neglect and truancy and insisting on documentation above that required by Marshall's Section 504 policy, was sent on March 6, 2014.  On March 11, 2014, Marshall concluded its Section 504 evaluation denying H.J. eligibility based on a lack of adequate medical information.  As alleged in the facts, the Plaintiffs were not a part of this determination and Marshall determined the correspondence and medical information to be collected for H.J.

The timing of the correspondence, the threats of truancy and educational neglect against H.J. when she had not yet met Marshall's criteria, the false allegations of physician-shopping, the exceptional documentation demands, the repeated challenge and rejection of legitimate medical excuses, the deviation from Marshall's practice of referring a truant student to human services, and on-going absolute refusal to recognize H.J.'s chronic medical conditions as they adversely affected her performance and attendance all speak to Marshall's actions as a pretext for denying the Plaintiffs their rights under the acts.

## CONCLUSION

Plaintiffs respectfully request that Defendant's Motion for Summary Judgment be denied in its entirety.

Respectfully submitted,

**KANE EDUCATION LAW, LLC.**

Dated: November 3, 2015          /s/ Margaret O'Sullivan Kane
                                 Margaret O'Sullivan Kane /ID # 220243
                                 Attorney for Plaintiffs
                                 420 Summit Avenue
                                 Suite 306
                                 Saint Paul, Minnesota 55102
                                 651/222-8611
                                 mkane@kaneeducationlaw.com